Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL X

| S.P.P.M.<br><br>Recurrente<br><br>V.<br><br>DEPARTAMENTO DE EDUCACIÓN<br><br>Recurrida | KLRA202300591 | *Revisión de Decisión Administrativa* procedente del Departamento de Educación<br><br>Caso Núm.: QEE-2324-27-08-00270<br><br>Sobre: Compra Servicios, Reembolso, Servicios Educativos, Compensatorios |
|---|---|---|

Panel integrado por su presidenta; la Juez Lebrón Nieves, la Juez Barresi Ramos y la Jueza Santiago Calderón

*Lebrón Nieves, Juez Ponente*

## SENTENCIA

En San Juan, Puerto Rico, a 28 de junio de 2024.

El 16 de noviembre de 2023, compareció ante este Tribunal de Apelaciones, la menor SPPM (en adelante, la menor) por conducto de sus padres con patria potestad, la señora Angelique Matos Lamourt (en adelante, señora Matos Lamourt) y el señor Rotsen Pérez Pérez (en adelante, señor Pérez Pérez y en conjunto, parte recurrente), por medio de *Recurso de Revisión Judicial.* Mediante este, nos solicita que revisemos la *Resolución Final* emitida y notificada el 23 de octubre de 2023, por el Foro Administrativo de Educación Especial del Departamento de Educación (en adelante, Foro Administrativo o foro recurrido). En virtud del aludido dictamen, el foro administrativo declaró No Ha lugar la *Querella* presentada por la parte recurrente sobre compra de servicios educativos para el año escolar 2023-2024 en el mercado privado.

Por los fundamentos que adelante se esbozan, se revoca la decisión recurrida y se ordena al Departamento de Educación el pago de los servicios reclamados.

**I**

Los hechos que suscitaron la controversia de epígrafe, se remontan a una *Querella* presentada el 24 de agosto de 2023, por la parte recurrente ante el Departamento de Educación. En la *Querella*, la señora Matos Lamourt sostuvo que, la menor se encontraba registrada en el Programa de Educación Especial del Departamento de Educación, del Distrito Escolar de San Juan. Adujo que, la menor tenía un diagnóstico de trastorno específico del aprendizaje con dificultades en lectura, escritura y cálculo, déficit de atención con hiperactividad y manifestaciones conductuales y emocionales asociadas con tales diagnósticos. Añadió que, debido a tales condiciones, la menor presentaba dificultades en múltiples áreas del aprendizaje, y que por ello, requería de "un proceso de enseñanza especialmente adaptado con atención individualizada, altamente estructurado, organizado, y con multiplicidad de acomodos y técnicas innovadoras de aprendizaje así como servicios relacionados". Expresó que, con el propósito de determinar cuál era la ubicación escolar apropiada para la menor respecto a sus condiciones, decidió someterla a un proceso evaluativo. Tal proceso fue llevado a cabo con la doctora Nanette Negrón, quien, según la parte recurrente, preparó un informe de evaluación con las recomendaciones de ubicación y de servicios relacionados, el cual fue discutido por el Comité de Programación y Ubicación (COMPU) en una reunión celebrada el 8 de agosto de 2023. Alegó que, de acuerdo a las recomendaciones de la doctora Nanette Negrón, la menor SPPM requería de una ubicación en un programa educativo y especializado, con una metodología y currículo dirigido principalmente hacia el desarrollo y fortalecimiento de destrezas

comunicológicas (verbales y no verbales), componentes lingüísticos, intención comunicológica, necesidades sensoriales, manejo apropiado y redirección de conductas maladaptativas y adquisición de destrezas de apresto educativo. De igual manera, indicó que, según el informe, la ubicación apropiada para la menor SPPM debía ser en un grupo de corriente regular no mayor a seis (6) estudiantes de igual o mayor dominio de destrezas cognoscitivas, académicas, conductuales, adaptativas y socioemocionales junto a asistente de servicios y en el cual se mantuviese la escritura y rutina necesaria para el proceso educativo de esta. Asimismo, sostuvo que, la menor necesitaba servicios relacionados y suplementarios como terapias del habla, terapia ocupacional, terapia psicológica, terapia educativa, alimentos escolares, transportación, evaluaciones, reevaluaciones y equipos de asistencia tecnológica.

De igual modo, la parte recurrente acotó que, aunque la agencia recurrida no ostentaba argumentos que refutaran las recomendaciones de la doctora Nannette Negrón, esta se limitó a aceptar el informe únicamente para fines de diagnóstico y terapia, y que, ignoró completamente las recomendaciones respecto a la alternativa de ubicación apropiada. Expresó que, para el año escolar 2023-2024, el Departamento de Educación realizó varios ofrecimientos que fueron rechazados debido a que no eran cónsonos con las recomendaciones para la menor conforme a sus necesidades. A tales efectos, alegó que, por motivo de que la agencia recurrida no le había ofrecido alternativas apropiadas, la menor tuvo que ser ubicada en el mercado privado para el año escolar 2022-2023. Sostuvo, además, que, la agencia recurrida carecía de alternativas apropiadas de ubicación y que, por ello, los padres de la menor se han visto en la obligación de mantenerla ubicada en el sector privado. Argumentó que, la ubicación de la menor en el sistema privado no podía ser considerada como una decisión

unilateral, en la medida en que esta, había sido producto de la falta de una alternativa apropiada en el sistema público. Adujo que, la menor SPPM tenía derecho a ser compensada por el tiempo en el que había estado privada de una alternativa de ubicación apropiada en el sistema público de enseñanza, y por aquellos servicios educativos y relacionados que estuvo privada de recibir. Añadió que, la menor SPPM también tenía derecho a que la agencia recurrida le brindara una educación pública, gratuita y apropiada, así como que, se le proveyeran los servicios relacionados a los cuales tiene derecho por ley, tales como terapias, equipos de asistencia tecnológica, asistente de servicios, evaluaciones, reevaluaciones y transportación, dietas o alimentos escolares. Conforme lo anterior, solicitó que se declarara Ha Lugar la *Querella*, y que se le ordenara al Departamento de Educación a cumplir con lo siguiente:

a. Adquirir la compra de servicios educativos, relacionados y suplementarios para la menor querellante para el año escolar 2023-2024 y siguientes hasta que el Departamento de Educación ofrezca una ubicación apropiada que satisfaga las necesidades de la menor;

b. Proveer a la menor todos los servicios educativos, relacionados y suplementarios que amerita;

c. Reembolsar a los padres de la menor toda suma invertida en el mercado privado tanto por servicios educativos como relacionados y suplementarios desde que la niña fue determinada elegible al Programa de Educación Especial hasta que la agencia querellada cumpla con sus responsabilidades a tales fines;

d. Proveer a la menor querellante las terapias que amerita en la modalidad, duración y frecuencia recomendadas, así como reembolsar a sus padres cualquier suma pagada en el mercado privado para satisfacer tales terapias;

e. Compensar a la menor querellante por el tiempo que ha estado privada de los servicios que debió haber recibido de parte de la agencia;

f. Realizar a la menor todas las evaluaciones o reevaluaciones que tiene recomendadas o que sean necesarias a tenor con su condición;

g.   Proveer a la menor los servicios de transportación que establece la Ley y reembolsar lo incurrido por los padres hasta que la agencia cumpla su responsabilidad;

h.   Reembolsar los costos de la evaluación de la Dra. Nannette Negrón;

i.   Cumplir con todas las disposiciones de Ley y las estipulaciones contenidas en el caso Rosa Lydia Vélez v. Departamento de Educación, KPE 80-1738 (907).

En respuesta, el Departamento de Educación presentó la *Contestación a Querella*. La parte recurrida sostuvo que, estaba realizando gestiones proactivas con el propósito de mitigar o resolver la situación presentada por la parte recurrente. Alegó, además, que, no se negaba a la provisión de servicios de educación especial a la menor SPPM, y que, negaba toda alegación de violación a los derechos del estudiante y al cumplimiento de los servicios estipulados en el Programa Educativo Individualizado (PEI).

El 9 de septiembre de 2023, fue señalada la vista administrativa para el 5 de octubre de 2023, a la 1:00 pm, mediante videoconferencia.

Posteriormente, la parte recurrente presentó la *Notificación de Prueba de la Parte Querellante[,] Objeciones a Contestación a Querella[,] Objeciones a Presentación de Prueba de la Parte Querellada[,] Solicitud de Sanciones por Violaciones al Debido Proceso de Ley*. Argumentó que, la *Contestación a Querella* no satisfacía los requisitos mínimos establecidos en el ordenamiento vigente y que, como consecuencia, no contaba con información sobre los criterios o fundamentos utilizados por la parte recurrida para denegar lo que fue solicitado en la *Querella* o para realizar ofrecimientos distintos a los propuestos en la evaluación de la doctora Nanette Negrón. De igual manera, sostuvo que, la *Contestación a Querella* no contenía una explicación de por qué el Departamento de Educación se negaba a tomar la acción planteada en la *Querella*; no tenía una descripción

de otras opciones consideradas por el COMPU y las razones por las cuales las mismas fueron rechazadas; no contenía una descripción de cada evaluación, procedimiento, avalúo, récord o informe que la agencia hubiese utilizado como base para rechazar lo solicitado en la *Querella*, y que, no contenía una descripción de aquellos factores relevantes para la agencia denegar lo solicitado. Adujo que, lo anterior hacía de la contestación una insuficiente de acuerdo a los requisitos legales y reglamentarios aplicables. Solicitó que, se tuviese por no contestada la querella y que se le anotara rebeldía a la parte recurrida o en la alternativa, que se les impusieran las sanciones correspondientes a casos de violación al debido proceso de ley.  Explicó que, el Departamento de Educación incumplió con las disposiciones acogidas en la Ley Federal de Educación Especial y en el Reglamento Federal respecto a lo que debe contener la contestación a la querella.

Subsiguientemente, la parte recurrida presentó *Enmienda a Contestación a Querella*. Mediante esta, alegó que, debido a que la menor fue registrada en el Programa de Educación Especial el 26 de julio de 2023, y su determinación de elegibilidad fue el 8 de agosto de 2023, no procedía el reembolso de servicios previo a su ingreso en el Programa. Igualmente, sostuvo que, había realizado ofrecimientos de ubicación de forma oportuna, pero que, en la reunión celebrada el 8 de agosto de 2023 en el COMPU, la madre de la menor había traído una propuesta de ubicación privada. Arguyó que, la madre de la menor no visitó las escuelas incluidas en el ofrecimiento del Departamento de Educación, que rechazó las ubicaciones y que, unilateralmente matriculó a la menor en la institución privada, Centro de Desarrollo Infantil AEIOU. Acotó que, tal acción conllevaba una violación al término de diez (10) días disponibles para el Departamento de Educación realizar otros ofrecimientos.  Añadió que, la señora Matos Lamourt no notificó a

la parte recurrida oportunamente el haber ubicado a la menor SPPM en AEIOU y que por ello, no tenía derecho al pago de los servicios educativos para el año escolar 2023-2024. Aseguró que, la parte recurrente había incumplido con los procedimientos establecidos en el Manual de Educación Especial o el estado de derecho vigente. Adujo que, el Departamento de Educación no se negaba a la provisión de servicios de educación especial a la menor, y negó toda alegación de violación a los derechos del estudiante y al cumplimiento de los servicios estipulados en el PEI.

El 28 de septiembre de 2023, el Departamento de Educación presentó la *Notificación de Prueba*.

Mediante *Notificación* emitida el 4 de octubre de 2023, la jueza administrativa determinó que la *Enmienda a Contestación a la Querella* presentada por la parte recurrida, exponía la posición de la agencia respecto a las alegaciones y remedios solicitados en la *Querella*.

Conforme a la *Orden Urgente*, el 5 de octubre de 2023 fue celebrada la vista administrativa. Según surge de dicha orden, por la parte recurrente comparecieron a la vista, la señora Matos Lamourt, su representante legal, el licenciado Osvaldo Burgos Pérez (en adelante, licenciado Burgos Pérez), la doctora Nannette Negrón, psicóloga clínica, y la señora Esperanza Dana Bobadilla, Directora de AEIOU (en adelante, señora Dana Bobadilla). Por la parte recurrida compareció la licenciada Cristina M. Abella Díaz y la señora Helga Milián Canales, facilitadora docente (en adelante, señora Milián Canales). La parte recurrente presentó el testimonio de la doctora Nannette Negrón, de la señora Dana Bobadilla y de la señora Matos Lamourt. Mientras que, la parte recurrida presentó el testimonio de la señora Helga Milián.

Asimismo, la prueba documental presentada por la parte recurrente consistió en: 1) la Propuesta de Servicios Educativos de

Centro de Desarrollo Infantil AEIOU del 7 de agosto de 2023, y 2) la carta de rechazo de ubicaciones del 17 de agosto de 2023. Como prueba estipulada, las partes presentaron: 1) la Evaluación Psicológica del 2 y 3 de agosto de 2023, realizada por la doctora Nannette Negrón; 2) la Planilla de Registro de 26 de julio de 2023; 3) el Informe de Evaluación Psicométrica y Psicoeducativa de mayo y junio de 2023, preparado por Aníbal Delgado Correa, Evaluador y estudiante practicante (en adelante, señor Delgado Correa), y el doctor Iván Bauzá Henríquez, Psicólogo Clínico (en adelante, doctor Bauzá Henríquez); 4) la Determinación de Elegibilidad de 8 de agosto de 2023; 5) la Minuta COMPU de 8 de agosto de 2023; 6) el PEI 2023-2024 de 8 de agosto de 2023; 7) cuatro visitas a alternativas de ubicación y localizaciones de 8 y 16 de agosto de 2023, y 8) la Minuta de 23 de agosto de 2023. De igual manera, se les concedió a las partes para que en o antes del 13 de octubre de 2023, sometieran sus memorandos de derecho.

El 13 de octubre de 2023, la parte recurrida presentó el *Memorando de Derecho*. En esencia, sostuvo que, la ubicación realizada por la señora Matos Lamourt en el Centro AEIOU fue de carácter unilateral. Explicó que, la ubicación unilateral se da en las instancias en que "[e]l personal del Programa de Educación Especial correspondiente a la región educativa de residencia del estudiante identifica una alternativa de ubicación apropiada a nivel público para implementar el Programa Educativo Individualizado (PEI) del estudiante, pero el padre, madre o encargado rechazan la misma y optan por matricularlo en una escuela o institución privada". Asimismo, expresó que, de acuerdo a la Ley IDEA la notificación deberá realizarse con diez (10) días de anticipación a la matrícula, entonces, a partir de tal notificación, el Departamento de Educación ostenta la responsabilidad de convocar al COMPU con el fin de discutir las razones que presenten los padres para intentar retener

al estudiante en la escuela. De igual manera, argumentó que, la señora Matos Lamourt, alegadamente había notificado su intención el jueves, 17 de agosto de 2023, mediante correo electrónico, donde indicó que, había visitado las escuelas referidas y una adicional a la que le recomendaron, pero que, ninguna satisfacía las necesidades de la menor SPPM, por lo cual, se veía obligada a rechazar las mismas y ubicar a la menor en el mercado privado y radicar una querella. Indicó que, el lunes, 21 de agosto de 2023 – 4 días calendario o 2 días laborales más tarde – matriculó a la menor en el Centro AEIOU. Ante ello, arguyó que, la matrícula de la menor SPPM fue realizada prematuramente y en detrimento de los derechos del Departamento de Educación a evaluar las razones del rechazo de los ofrecimientos y determinar si procedía un ofrecimiento de FAPE que permitiera retener a la menor.

La parte recurrida arguyó que, había convocado un COMPU para el miércoles, 23 de agosto de 2023, en el cual se pudieron haber atendido las preocupaciones de la señora Matos Lamourt. Reiteró que, el Departamento de Educación tenía derecho a ser notificado con al menos diez (10) días laborales antes de la matrícula en el Centro AEIOU para así poder retener a la menor SPPM en el sistema de educación pública. Añadió que, la señora Matos Lamourt había realizado la ubicación de forma unilateral y que, debido a que el Departamento de Educación había realizado una FAPE, no tenía el deber de cubrir el costo de esta. Finalmente, expresó que, la compra de servicio era un recurso que procedía cuando podía probarse que efectivamente el Departamento de Educación no había podido proveer una educación pública gratuita y apropiada.

Por otro lado, la parte recurrente presentó su *Memorando de Derecho.* En su escrito, la parte recurrente sostuvo que, conforme a la prueba documental, testifical y pericial que fue presentada en la vista administrativa, surgía de forma clara que, la ubicación

apropiada para la menor era la recomendada en la evaluación de la doctora Nannette Negrón. Arguyó, además, que el Departamento de Educación nunca le ofreció a la menor una alternativa de ubicación apropiada conforme a sus necesidades particulares, y que se limitó a realizar tres ofrecimientos de ubicaciones que no eran cónsonos con estas. De igual forma, adujo que, a pesar de que la señora Matos Lamourt había matriculado a la menor en la institución privada a los cuatro (4) días de haber rechazado los ofrecimientos de la parte recurrida, nada le impedía a esta última hacer ofrecimientos adicionales apropiados a los hechos el 8 de agosto de 2023. Argumentó que, a la luz del estado de derecho vigente, ante la falta de una alternativa de ubicación apropiada en el sistema público, procedía la compra de servicios solicitada. Asimismo, aseguró que, la institución privada contaba con la alternativa de ubicación apropiada para la menor, conforme a lo recomendado por la doctora Nannette Negrón. Igualmente, expresó que, la Ley IDEA provee para que una agencia educativa, como el Departamento de Educación, compre en el sector privado aquellos servicios educativos y relacionados que no estuviesen disponibles en el sector público. La parte recurrente, también sostuvo que, en el caso en que se determine que la agencia educativa incumplió en ofrecerle al estudiante una ubicación pública, gratuita y apropiada en tiempo, el Juez Administrativo o la Jueza Administrativa deberá "determinar que los servicios en la ubicación en la institución privada sugerida son adecuados para atender las necesidades del estudiante y redundarán en un beneficio educativo para este". De igual manera, reiteró que, ante la falta de una alternativa de ubicación apropiada para la menor, esta tenía derecho a que se le comprara el servicio en la institución privada. Finalmente, adujo que, el Departamento de Educación pudo ofrecer una alternativa de ubicación en el sistema público conforme a las recomendaciones de la doctora

Nannette Negrón, no obstante, no lo hizo y no lo había hecho hasta la fecha del memorando. Añadió, además que, no procede la postura del Departamento de Educación respecto a que la señora Matos Lamourt ubicó a la menor en el sistema privado unilateralmente, ya que, para que exista una ubicación unilateral, era necesario que la agencia hubiese ofrecido una alternativa de ubicación apropiada en el sistema público, lo cual alega que no sucedió en el caso de epígrafe.

El 23 de octubre de 2023, el foro recurrido emitió la *Resolución Final* cuya revisión nos atiene.  Por medio de esta esbozó las siguientes determinaciones de hechos:

1. La estudiante es una menor de 7 años de edad que fue determinada elegible al Programa de Educación Especial el 8 de agosto de 2023 bajo el diagnóstico de Problemas Específicos de Aprendizaje. (SAEE-05 Determinación de Elegibilidad).

2. Para el año escolar 2022-2023[,] la estudiante estuvo ubicada en una institución privada. En este año escolar a la estudiante se le hizo muy difícil completarlo.

3. En mayo y junio de 2023 a la estudiante se le realizó Evaluación Psicométrica y Psicoeducativa. Según las evaluaciones y pruebas que se le realizaron la estudiante, en resumen, tiene un funcionamiento cognitivo y habilidad intelectual promedio bajo y dificultad en las destrezas de matemáticas, lectura y escritura.

4. Su diagn[ó]stico es Trastorno de Déficit de Atención/Hiperactividad combinada severo y Trastorno Espec[í]fico de Aprendizaje severo con especificadores de deficiencia en lectura (dislexia) en expresión escrita y en matemáticas (Discalculia).

5. Recomendó, entre otras, el servicio de Salón Recurso bajo el Programa de Educación Especial.

6. La madre testificó que el 29 y 30 de junio de 2023 fue a registrar a su hija en el Programa de Educación Especial. Informó que estaba en la espera de que le hicieran entrega de un informe de una evaluación que le había realizado a su hija. En el Departamento de Educación le indicaron que una vez tuviera el informe fuera a registrarla en el Programa de Educación Especial.

7. No es hasta el 29 de julio de 2023 que la madre de la estudiante acude al Departamento de Educación y registra a su hija al Programa de Educación Especial.

8. El 2 y 3 de agosto de 2023 se le realiza a la estudiante una Evaluación Psicológica privada.

9. El 7 de agosto de 2023 la institución privada, a solicitud de la madre de la estudiante, prepara una Propuesta de Servicios Educativos para el año escolar 2023-2024.

10. La reunión para determinar la elegibilidad de la menor fue realizada el 8 de agosto de 2023. (Minuta 8 de agosto de 2023)

11. En la reunión estuvieron presentes, la madre de la estudiante Querellante, la Psicóloga Clínica que le realizó a la estudiante la Evaluación Psicológica del 2 y 3 de agosto de 2023, y la Directora de la institución privada, quien acudió a la reunión para aclarar dudas sobre la propuesta de servicios que había redactado. Por el DE participó la Facilitadora de Educación Especial, un maestro, un representante autorizado. (Minuta 8 de agosto de 2023).

12. Como aún no se había determinado la elegibilidad de la estudiante al programa de Educación Especial, la Directora de la institución privada se retiró de la reunión.

13. La evaluación [sic] Evaluación Psicométrica y Psicoeducativa de mayo y junio de 2023, fue discutida en el COMPU y aceptada por todas las partes. (Minuta 8 de agosto de 2023).

14. La estudiante fue determinada elegible al Programa de Educación Especial el 8 de agosto de 2023 bajo la categoría de Problemas Específicos de Aprendizaje. La determinación fue basada en [la] Evaluación Psicométrica y Psicoeducativa. (SAEE05 Determinación de elegibilidad inicial del 8 de agosto de 2023 y Minuta de la Determinación de Elegibilidad del 8 de agosto de 2023) (Testimonio de la Facilitadora Docente). La determinación de Elegibilidad fue firmada por la madre de la estudiante Querellante, la Psicóloga Clínica, la Facilitadora Docente y el Representante Autorizado del DE.

15. La ubicación recomendada y establecida en la propuesta de Programa Educativo Individualizado 2023-2024 se basó en las fortalezas y necesidades contempladas en la evaluación psicométrica y psicoeducativa que se realizó a través del DE: salón regular con servicios suplementarios. (Minuta 8 de agosto de 2023)

16. Luego de la determinación de la elegibilidad y el comienzo de la redacción del borrador del PEI 2023-2024 la madre solicita la discusión de la Evaluación Psicológica del 2 y 3 de agosto de 2023 y es cuando envía copia de esta evaluación a la Facilitadora Docente.

17. Se discutieron los hallazgos de la evaluación privada y se le informó a la madre que las recomendaciones de los especialistas no eran determinaciones del COMPU.

18. Durante la reunión del 8 de agosto de 2023 el DE realizó ofrecimientos para la ubicación de la estudiante tres escuelas con la ubicación en salón regular con servicios suplementarios y apoyo. Según la Determinación de elegibilidad que se firmó y la Minuta. (Minuta 8 de agosto de 2023, Acuerdo número 8) (SAEE-07b Visitas a Alternativas de ubicación y localizaciones con fecha del 8 de agosto de 2023)

19. La Evaluación Psicológica privada confirmó el diagnóstico de trastorno específico del aprendizaje en las áreas de lectura, escritura y matemática, con un desarrollo cognoscitivo promedio, y promedio bajo, un trastorno de déficit de atención con hiperactividad e indicadores emocionales relacionados con comunicación funcional, ansiedad, hiperactividad y problemas de atención. Recomendó que la estudiante fuera ubicada en un grupo regular no mayor a seis estudiantes de igual o mayor dominio de destrezas comunicológicas.

20. El COMPU acordó que el PEI 2023-2024 quedaría en borrador hasta que la madre de la estudiante visitar[a] las alternativas de ubicación provistas por la Facilitadora. (Minuta 8 de agosto de 2023, Acuerdo número 10)

21. Las partes acordaron reunirse en COMPU el 23 de agosto de 2023 para discutir la ubicación y PEI de la estudiante. (Minuta 8 de agosto de 2023, Acuerdo número 9)

22. La madre de la estudiante visitó las escuelas ofrecidas en la reunión de Determinación de Elegibilidad del 8 de agosto de 2023, el 15 y 16 de agosto de 2023. Sin embargo, la ubicación que solicitó y requirió la madre de la estudiante en las escuelas visitadas fue la recomendada por la Psicóloga Clínica en la evaluación privada de un grupo reducido de 6 estudiantes y no la establecida en la Determinación de Elegibilidad y Minuta, de un salón regular con servicios suplementarios.

23. La madre de la estudiante visitó una cuarta escuela y tampoco tenía disponible la ubicación recomendada por la Psicóloga Clínica en la evaluación privada.

24. El 17 de agosto de 2023, por vía de un correo electrónico a la Facilitadora, la madre de la estudiante rechaz[ó] las escuelas ofrecidas expresando: "Realicé las visitas a las escuelas referidas y a una adicional que me recomendaron. Desafortunadamente ninguna satisface las necesidades de la niña por lo cual me veo obligada a rechazar las mismas. Ante esta situación no me queda más alternativa que ubicar a la menor en el mercado privado y radicar la correspondiente querella." (Testimonio de la madre de la estudiante Querellante y correo electrónico enviado).

25. La madre de la estudiante matriculó a su hija el lunes, 21 de agosto de 2023 en la institución privada. A 4 días calendario luego de haber notificado a la Facilitadora su rechazo e intención el 17 de agosto de 2023. (Correo electrónico)

26. El 23 de agosto de 2023, según acordado entre las partes, se reunió el COMPU para Análisis o Enmienda de Ubicación. Durante la reunión, se firmó el PEI 2023-2024 en controversia por la ubicación. Se encontraban presentes, la madre de la estudiante, la Facilitadora Docente de Educación Especial, y la Representante Autorizada del DE. (Minuta del 23 de agosto de 2023)

27. La madre de la estudiante entregó el documento de rechazo para cada una de las escuelas ofrecidas el 8 de agosto de 2023 durante la reunión de COMPU e indicó que la estudiante ya estaba matriculada en la institución privada y que radicaría una querella para la compra de servicios. (Testimonio de la facilitadora y la madre de la estudiante Querellante)

28. La madre de la estudiante Querellante testificó que la decisión de matricular a la estudiante en la escuela privada fue suya.

29. La madre de la estudiante Querellante no aceptó ofrecimientos nuevos […] pues entendía que a través de la querella obtendría la compra de servicios. (Testimonio madre de la estudiante Querellante)

30. La Directora de la institución privada indicó que la Propuesta de Servicios Educativos la redactó tomando en consideración las recomendaciones de la Evaluación Psicológica privada.

31. Reconoció que el salón en el cual está matriculada la estudiante es un grupo de corriente regular con […] 5 estudiantes, según la recomendación de cantidad de estudiantes de la Evaluación Psicológica privada. Sin embargo, los maestros no están certificados en educación especial, ni en autismo. De igual modo, se reconoció que están en espera de la autorización de la compra de servicios para entonces comenzar los procesos para la

contratación de un asistente individual para la estudiante. (Testimonio de la Directora de la Institución privada)

32. Indicó que la estudiante está recibiendo las terapias por Remedio Provisional y podrían continuar recibiéndose por dicho modo. (Testimonio de la Directora de la institución privada)

Finalmente, la Juez Administrativa concluyó que, se había constituido una ubicación unilateral conforme establece la Ley IDEA. Por ello, declaró No Ha Lugar la solicitud del pago de los gastos de los servicios educativos para el año escolar 2023-2024 en la institución privada.

Inconforme, la parte recurrente acudió ante este foro y esgrimió los siguientes señalamientos de error:

- Erró el foro administrativo recurrido al resolver que no procede la compra de servicios solicitada ante la falta de una alternativa de ubicación en el mercado público.

- Erró el foro administrativo recurrido al no resolver que las alternativas de ubicación propuestas por la agencia querellada no satisfacen las necesidades particulares de la menor querella[nte].

- Erró el foro administrativo en su apreciación de la totalidad de la prueba oral, pericial y documental presentada en la vista administrativa al obviar por completo la evidencia sobre las necesidades particulares de la menor, sobre la necesidad de la alternativa de ubicación que está proveyendo la alternativa privada propuesta y sobre el derecho a compra de servicio solicitada.

- Erró el foro administrativo en su aplicación del derecho en este caso particularmente lo dispuesto en los casos normativos School Comittee of the Town of Burlington v. Department of Education, 471 U.S. 359 (1985) y Florence County v. Carter, 510 U.S. 7 (1993) sobre el derecho a compra de servicios en el mercado privado y lo resuelto en Endrew F. v. Douglas County, 580 U.S ___ (2017) sobre la obligación del Departamento de Educación de proveer a la menor una alternativa de ubicación apropiada.

- Erró el foro administrativo recurrido al privar a la parte querellante-recurrente de su debido proceso de ley al prohibir la presentación de una solicitud de reconsideración en este tipo de casos, esto a pesar de que la agencia recurrida no ha puesto en efecto la estructura requerida por la Ley Federal

para la solución de querellas y su proceso de revisión interna en la agencia.

Por otro lado, el 19 de abril de 2024, la parte recurrida presentó el *Alegato en Oposición*.

Con el beneficio de la comparecencia de las partes, procedemos a resolver.

## II

**A.** ***Estándar de Revisión Judicial de Determinaciones Administrativas***

Según es sabido, los tribunales apelativos debemos otorgar amplia deferencia a las decisiones emitidas por las agencias administrativas, puesto que, estas cuentan con vasta experiencia y pericia para atender aquellos asuntos que se les han sido delegados por la Asamblea Legislativa. *OEG v. Martínez Giraud*, 210 DPR 79 (2022); *Hernández Feliciano v. Mun. Quebradillas*, 211 DPR 99 (2023); *Pérez López v. Depto. Corrección*, 208 DPR 656, 672 (2022); *Super Asphalt v. AFI y otros*, 206 DPR 803, 819 (2021).[1] Es por ello, que, tales determinaciones suponen una presunción de legalidad y corrección, que a los tribunales nos corresponde respetar, mientras la parte que las impugne no presente prueba suficiente para derrotarlas. *Íd.*; *OEG v. Martínez Giraud*, supra, pág. 89; *Hernández Feliciano v. Mun. Quebradillas*, supra, pág. 114; *Batista, Nobbe v. Jta. Directores*, 185 DPR 206, 216 (2012). No obstante, tal norma no es absoluta, es por lo que, nuestro Máximo Foro ha enfatizado que no podemos imprimirle un sello de corrección, so pretexto de deferencia a las determinaciones administrativas que sean irrazonables, ilegales o contrarias a derecho.

---

[1] Véase también: *Graciani Rodríguez v. Garaje Isla Verde*, 202 DPR 117, 126 (2019); *Rolón Martínez v. Supte. Policía*, 201 DPR 26,35 (2018); *Torres Rivera v. Policía de PR*, 196 DPR 606, 626 (2016); *Asoc. Fcias. v. Caribe Specialty et al. II*, 179 DPR 923, 940 (2010).

En *Torres Rivera v. Policía de PR*, supra, pág. 628, nuestro Tribunal Supremo resumió las normas básicas en torno al alcance de la revisión judicial de la forma siguiente:

> [L]os tribunales deben deferencia a las decisiones de una agencia administrativa, pero tal deferencia cederá cuando: (1) la determinación administrativa no está basada en evidencia sustancial; (2) el ente administrativo erró en la aplicación o interpretación de las leyes o reglamentos que se le ha encomendado administrar; (3) el organismo administrativo actuó arbitraria, irrazonable o ilegalmente, realizando determinaciones carentes de una base racional, o (4) la actuación administrativa lesionó derechos constitucionales fundamentales. Es importante destacar que **si el tribunal no se encuentra frente a alguna de esas situaciones, aunque exista más de una interpretación razonable de los hechos procede que se valide la interpretación que realizó la agencia administrativa recurrida**. (Énfasis suplido).[2]

El criterio rector bajo el cual los tribunales deben revisar las decisiones administrativas es el criterio de razonabilidad. *OEG v. Martínez Giraud*, supra, pág. 89; *Super Asphalt v. AFI y otros*, supra, pág. 820; *Graciani Rodríguez v. Garaje Isla Verde*, supra, pág. 127; *Torres Rivera v. Policía de PR*, supra, pág. 626. Bajo este criterio, se limita la revisión judicial a dirimir si la agencia actuó de forma arbitraria o ilegal, o de manera tan irrazonable que su actuación constituya un abuso de discreción. *Íd.*; *Pérez López v. Depto. Corrección*, supra, pág. 673; *OEG v. Martínez Giraud*, supra, pág. 90; *Super Asphalt v. AFI y otros*, supra, pág. 819-820; *Graciani Rodríguez v. Garaje Isla Verde*, supra, pág. 127; *Rolón Martínez v. Supte. Policía*, supra, pág. 36; *Batista, Nobbe v. Jta. Directores*, pág. 216.

Bajo este supuesto, la Sec. 4.5 de la Ley Núm. 38 del 30 de junio de 2017, 3 LPRA 9675, conocida como la Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico (LPAU), "estableció el marco de revisión judicial de las agencias administrativas". *Rolón Martínez v. Supte. Policía*, supra, pág. 35. La

---

[2] Véase *Super Asphalt v. AFI y otros*, supra, págs. 819-820.

intervención del tribunal se limita a tres áreas, a saber: (1) si el remedio concedido por la agencia fue apropiado; (2) si las determinaciones de hecho que realizó la agencia están sostenidas por evidencia sustancial que obra en el expediente administrativo visto en su totalidad, y (3) si las conclusiones de derecho del ente administrativo fueron correctas. *Íd.* págs. 35-36; *OEG v. Martínez Giraud,* supra, pág. 90*; Torres Rivera v. Policía de PR*, supra, págs. 626-627; *Hernández Feliciano v. Mun. Quebradillas,* supra, pág. 115; *Batista Nobbe v. Jta. Directores,* supra, pág. 217; Sec. 4.5 de la LPAU, 3 LPRA sec. 9675.   Nuestro Máximo Foro, ha expresado que, esta intervención "debe ocurrir cuando la decisión administrativa no se fundamente en evidencia sustancial o cuando la agencia se equivoque en la aplicación de la ley".  *Rolón Martínez v. Supte. Policía,* supra, pág. 36.   Siendo así, aquellas determinaciones de hechos formuladas por el ente administrativo deberán sostenerse cuando estén basadas en evidencia sustancial que surja del expediente administrativo considerado en su totalidad. *Íd; OEG v. Martínez Giraud,* supra, pág. 90; *Super Asphalt v. AFI y otros,* supra, pág. 819-820; *Hernández Feliciano v. Mun. Quebradillas*, supra, pág. 115. Por otro lado, las determinaciones de derecho pueden ser revisadas en su totalidad. *Rolón Martínez v. Supte. Policía,* supra, pág. 36; *Torres Rivera v. Policía de PR*, supra, pág. 627; Sec. 4.5 LPAU, 3 LPRA sec. 9675.   No obstante, los tribunales deberán darles peso y deferencia a las interpretaciones que la agencia realice de aquellas leyes particulares que administra. *Rolón Martínez v. Supte. Policía*, supra, págs. 36-37; *Torres Rivera v. Policía de PR*, supra, pág. 627.   El Tribunal Supremo ha dispuesto que, la deferencia que le deben los tribunales a la interpretación que haga el ente administrativo sobre aquellas leyes y reglamentos que le corresponde poner en vigor, cede si la agencia: "(1) erró al aplicar la ley; (2) actuó arbitraria, irrazonable o ilegalmente, o (3) lesionó derechos constitucionales

fundamentales. *Íd.* págs. 627-628; *OEG v. Martínez Giraud*, supra, pág. 90. Finalmente, nuestra más Alta Curia ha expresado que, conforme lo anterior, el criterio administrativo no podrá prevalecer en aquellas instancias donde la interpretación estatutaria realizada por una agencia provoque un resultado incompatible o contrario al propósito para el cual fue aprobada la legislación y la política pública que promueve. Así, "la deferencia judicial al *expertise* administrativo, concedido cuando las agencias interpretan la ley, tiene que ceder ante actuaciones que resulten irrazonables, ilegales o que conduzcan a la comisión de una injusticia". *Íd.*

## B. Sobre Educación Especial

Según es sabido, en Puerto Rico el derecho a la educación tiene rango constitucional. *Declet Ríos v. Departamento de Educación*, 177 DPR 765, 773 (2009); *Orraca López v. ELA*, 192 DPR 31, 40 (2014). Cónsono con lo anterior, el Artículo II, Sec. 5 de la Constitución del Estado Libre Asociado de Puerto Rico, LPRA, Tomo 1, ed. 1982, pág. 271, dispone en lo pertinente:

> Toda persona tiene derecho a una educación que propenda al pleno desarrollo de su personalidad y al fortalecimiento del respeto de los derechos del hombre y de las libertades fundamentales. Habrá un sistema de instrucción pública el cual será libre y enteramente no sectario. La enseñanza será gratuita en la escuela primaria y secundaria y, hasta donde las facilidades del Estado lo permitan, se hará obligatoria para la escuela primaria. *Asoc. Academias y Col. Cristianos v. ELA,* 135 DPR 150, 168 (1994).

El propósito principal de la cláusula es definir las aspiraciones colectivas sobre la educación y crear un sistema de enseñanza pública a niveles primario y secundario exclusivamente. El lenguaje utilizado en el citado artículo y el claro historial de esta disposición en la Convención Constituyente indican, sin lugar a dudas, que el derecho a la educación allí reconocido se limita a la educación a niveles primarios y está sujeto a que el Estado tenga los recursos necesarios para su implantación. *Asoc. Académias y Col. Cristianos*

*v. ELA,* supra, a las pág. 168-169; *Orraca López v. ELA,* supra, pág. 41.

En *AMPR v. Srio. Educación,* 178 DPR 253 (2010), nuestro Tribunal Supremo expresó:

El derecho a la educación es de tal importancia que los miembros de la Asamblea Constituyente incluyeron "el afán por la educación" como uno de los factores determinantes en nuestra vida como pueblo democrático.[3]

Por tal razón, este Tribunal también ha reconocido la importancia que disfruta la educación en nuestra jurisdicción. Así pues, hemos resuelto que el Estado tiene un interés apremiante en que la educación, tanto pública como privada, sea una de excelencia.[4] Además, expresamente hemos apuntalado que "a través de la educación se imparte la preparación necesaria para que los ciudadanos participen en el desarrollo social y económico de nuestra vida colectiva".[5]

En consecuencia, debido a las raíces constitucionales que nutren el derecho a la educación, nuestra Asamblea Legislativa ha creado y modificado en varias ocasiones las leyes que buscan hacer realidad dicho derecho. Como hemos mencionado, éste intenta proveer a nuestros niños y adolescentes la oportunidad de recibir una educación de excelencia y que propenda al pleno desarrollo de su personalidad, tal y como anhelaban los miembros de la Asamblea Constituyente.

Así pues, estos principios constituyeron la piedra angular de la Ley Orgánica del Departamento de Educación Pública de Puerto Rico, Ley Núm. 149, *supra,* la cual se fundamenta sobre tres premisas básicas:

(1) El estudiante es la razón de ser del sistema educativo y el maestro su recurso principal.

(2) La interacción entre estudiantes y maestros constituye el quehacer principalísimo de la escuela. Las demás actividades escolares, independientemente de su índole, se justifican sólo cuando facilitan la docencia, mejoran la gestión educativa o fortalecen los servicios de la escuela a la comunidad.

(3) Las escuelas pertenecen a las comunidades que sirven y estas deben participar en su gobierno.[6]

---

[3] Véase, Preámbulo de la Constitución del Estado Libre Asociado de Puerto Rico, LPRA, Tomo 1; Véase además, *Asoc. Maestros P.R. v. Srio. Educación,* 137 DPR 528, 569 (1994), (Naveira de Rodón, J., op. conformidad, escolio 19).

[4] *Asoc. Academias y Col. Cristianos v. ELA,* supra, pág. 164.

[5] Íd.; Véase, *De Paz Lisk v. Aponte Roque,* 124 DPR 472 (1984).

[6] Art. 1.02, secs. (a) y (b) de la Ley Núm. 149 de 15 de julio de 1999, según enmendado.

Respecto a las personas con impedimentos, el Alto Foro expresó en *Bonilla v. Chardón,* 118 DPR 599, 605-606 (1978) que: [a]unque por muchos siglos las sociedades han marginado, discriminado y estigmatizado a las personas con impedimentos físicos, en las últimas dos décadas el estado moderno ha tomado medidas afirmativas para incorporarlas a la comunidad. Entre los cambios más notables se destaca el reconocimiento de su derecho a recibir y reclamar judicialmente educación remedial. (Citas omitidas).

Con este escenario como norte, para los años setenta la Asamblea Legislativa aprobó la Ley Núm. 21 de 22 de julio de 1977, conocida como Ley del Programa de Educación Especial, 18 LPRA sec. 1331, et. seq. Al aprobarse el estatuto, la Asamblea Legislativa utilizó como modelo la entonces vigente Ley Federal de Educación Especial, Ley Púb. Núm. 94-142[7], de 29 de noviembre de 1975 (89 Stat. 773), conocida en inglés como *Education for All Handicapped Children Act of 1975. Declet Ríos v. Departamento de Educación*, supra, a la pág. 774, citando a *Bonilla v. Chardón,* supra.  Ambas leyes, la federal y la estatal, reconocían el derecho de los niños y niñas con impedimentos físicos a tener acceso al sistema de educación pública mediante un plan de enseñanza individualizado que atendiera sus necesidades. *Íd.*

Luego, en el 1990 el Congreso de los Estados Unidos aprobó la ley conocida como *Individuals with Disabilities Education Act* (IDEA). Con posterioridad, la referida legislación se enmendó en el 2004, por la ley federal conocida como *Individuals with Disabilities Education Improvement Act* (IDEIA).

La Ley Federal de Educación Especial tiene entre sus propósitos asegurar que los niños y las niñas con impedimentos

---

[7] 20 USC sec. 1400 et seq.

reciban una educación pública, apropiada, gratuita y que atienda las necesidades especiales de cada estudiante; que los derechos de los menores con impedimentos y sus padres sean protegidos, y evaluar y asegurar la efectividad de los esfuerzos para educarlos. Ley Púb. Núm. 108-446, 20 USCA sec. 1400(d)(1), (2) y (4). Para ello, provee una serie de requisitos sustantivos y procesales. *Declet Ríos v. Departamento de Educación*, supra, a la pág. 777.

En virtud de lo establecido en estas leyes federales y en amparo al mandato constitucional, la Asamblea Legislativa derogó la Ley Núm. 21, *supra*, y aprobó la Ley Núm. 51 de 7 de junio de 1996, conocida como "Ley de Servicios Educativos Integrales para Personas con Impedimentos", 18 LPRA sec. 1351 et seq. Esta Ley ratifica el derecho de las personas con impedimentos a recibir una educación pública, gratuita y de acuerdo a sus necesidades, que le permita desarrollarse plenamente y convivir con dignidad en la comunidad de la que forman parte. Con este propósito se establecen claramente las responsabilidades y funciones de todas las agencias que deben brindar servicios especializados y profesionales directos o relacionados a este sector de la población.[8] *Orraca López v. ELA*, supra, pág. 41.

Como parte de la declaración de política pública, dicho estatuto dispone, en su Artículo 3 sec. 1352, lo siguiente:

> El Gobierno de Puerto Rico se reafirma en su compromiso de promover el derecho constitucional de toda persona a una educación gratuita que propenda al "pleno desarrollo de su personalidad y al fortalecimiento del respeto de los derechos del hombre y de las libertades fundamentales". Para el logro de este propósito se trabajará conjuntamente con la familia, ya que el desarrollo integral de la persona con impedimentos debe estar enmarcado en su contexto familiar.
>
> Forma parte de esta política pública sobre las personas con impedimentos, hasta donde los recursos del Estado lo permitan, garantizar:

---

[8] Véase: Exposición de Motivos de la "Ley de Servicios Educativos Integrales para Personas con Impedimentos".

(1) Una educación pública, gratuita y apropiada, en el ambiente menos restrictivo posible, especialmente diseñada de acuerdo a las necesidades individuales de las personas con impedimentos y con todos los servicios relacionados indispensables para su desarrollo, según se establezca en su plan individualizado de servicios, y lo más cerca posible de las demás personas sin impedimentos. Esto aplica tanto a las escuelas públicas del Departamento de Educación como a las Escuelas de la Comunidad bajo la administración del Instituto de Reforma Educativa.

(2) Un proceso de identificación, localización, registro y una evaluación por un equipo multidisciplinario debidamente calificado de todas las personas con posibles impedimentos, dentro o fuera de la escuela, desde el nacimiento hasta los veintiún (21) años de edad inclusive.

(3) El diseño de un Programa Educativo Individualizado (PEI) que establezca las metas a largo y corto plazo, los servicios educativos y los servicios relacionados indispensables según lo determine el equipo multidisciplinario.

(4) La confidencialidad de toda información personal.

(5) Un sistema sencillo, rápido y justo de ventilación de querellas.

(6) La participación de los padres en la toma de decisiones en todo proceso relacionado con sus hijos.

[...]

En vista de lo anterior, la Ley Núm. 51, *supra*, y los reglamentos relacionados responden a la obligación del Estado de cumplir con la Ley Federal de Educación Especial, *supra*, y sus reglamentos.[9] [. . .]. El estatuto federal requiere, *inter alia*, que los estados que se benefician de fondos federales del Departamento de Educación de los Estados Unidos (U.S. Department of Education) establezcan programas de educación especial pública, gratuita, apropiada y que atiendan las necesidades especiales de cada

---

[9] "[Individuals with Disabilities Education Act (IDEA)] leaves to the States the primary responsibility for developing and executing educational programs for handicapped children, but imposes significant requirements to be followed in the discharge of that responsibility." (Énfasis suplido.) *Schaffer v. Weast,* 546 US 49, 52 (2005). Véase *Board of Ed. v. Rowley,* 458 US 176 (1982).

estudiante.[10] *Orraca López v. ELA*, supra, pág. 41. Puerto Rico se beneficia de dichos fondos desde los años setenta y, por tanto, está obligado a cumplir con ésta. *Declet Ríos v. Departamento de Educación*, supra, a las pág. 775-776.

La educación pública, gratuita y apropiada es definida por la Ley Federal de Educación Especial, *supra*, como la educación especial y los servicios relacionados pagados por el erario público y bajo supervisión y dirección pública que cumplen las exigencias de la agencia educativa estatal, los cuales incluyen educación preescolar, elemental o secundaria y se proveen conforme el programa educativo individualizado (PEI). 20 USC 1401 (9). El PEI es, en síntesis, el plan escrito de las necesidades educacionales del menor con impedimento y la educación y servicios relacionados a proveerse especialmente diseñados para cumplir con esas necesidades. 20 USC 1401 (14) y 1414 (d); *School Committee v. Dept. of Educ*, 471 US 359, 368 (1985). La educación pública, gratuita y apropiada está disponible para todos los niños con impedimento que residan en los estados entre las edades de tres (3) a veinte y un (21) años. 20 USC 1412 (1) (A). Asimismo, la Ley Núm. 51-1996, *supra*, define la *educación especial* como una "enseñanza pública gratuita especialmente para responder a las necesidades particulares de la persona con impedimentos, en el ambiente menos restrictivo". 18 LPRA sec. 1351 (7). La IDEA exige a toda agencia educativa que reciba asistencia al amparo de estas disposiciones, a establecer y mantener procedimientos para asegurar que los niños con impedimento y sus padres, tengan garantizados salvaguardas procesales ("procedural safeguards") con miras a lograr que se le provea una educación pública gratuita y apropiada. 20 USC 1415

---

[10] Ley Púb. Núm. 108-446, de 3 de diciembre de 2004 (118 Stat. 2647), 20 U.S.C. sec.1401(31) ("The term "State" means each of the 50 States, the District of Columbia, the Commonwealth of Puerto Rico, and each of the outlying.").

(a).  Entre los procedimientos requeridos por la antes mencionada sección deben incluir entre otros: permitir que los padres puedan obtener una evaluación educativa independiente de su hijo con impedimento y la oportunidad a cualquier parte de presentar una querella. 20 USC 1415 (b)(1) y (b)(6); *School Committee v. Dept. of Educ,* supra, pág. 368.

Por otro lado, el Departamento de Educación promulgó el *Manual de Procedimientos de Educación Especial* del 2020.  Entre otras cosas, en su sección 7.1, este establece que el PEI "[e]s el documento donde se establecen las necesidades académicas y funcionales del estudiante y cómo serán minimizadas a través de los servicios que el programa de educación especial ofrece con el propósito de garantizar que el estudiante reciba una educación pública, gratuita y apropiada conocida como FAPE, por sus siglas en inglés"[11].  Además, el PEI recoge los acuerdos de aquellos servicios educativos, relacionados y suplementarios que el Departamento de Educación se compromete a ofrecerle al estudiante o la estudiante[12].  A su vez, es el documento oficial "[q]ue contiene servicios cobijados por legislación federal y estatal".[13]

El referido manual, dispone que, tanto la legislación federal y estatal garantizan el derecho del estudiante con discapacidad a ser educado en igualdad de condiciones que un estudiante sin discapacidad. La ley IDEA dispone que, el Departamento de Educación tendrá disponible diferentes ambientes educativos (alternativas de ubicación) apropiados donde implementar el PEI para lograr que el estudiante con discapacidad se eduque y logre progresar en el currículo general.[14] El proceso de ubicación consta de dos procesos:

---

[11] Sección 7.1 del *Manual de Procedimientos de Educación Especial*, pág. 65.
[12] *Íd.*
[13] *Íd.*
[14] Sección 8.1 del *Manual de Procedimientos de Educación Especial*, pág. 80.

a. **La determinación de la alternativa de ubicación** donde se implementará el PEI – Una alternativa de ubicación es el ambiente educativo o el tipo de salón donde el estudiante recibirá su educación y donde se implementará el PEI. Esta ubicación será en una escuela pública, apropiada para el estudiante y de forma gratuita para los padres. En la legislación federal se le conoce como "*Free, appropriate public education*" (FAPE, por sus siglas en inglés). La FAPE garantiza que el estudiante se le:

   i. Ofrezca una educación especial que le permita satisfacer las necesidades particulares que presenta.

   ii. Provea servicios relacionados que ayuden al estudiante a beneficiarse de la educación especial.

   iii. Proporcione esos servicios de manera gratuita.

   iv. Provea adaptaciones y acomodos razonables para ayudarlo a aprender y a participar en el programa de educación general.

   v. Cree un PEI donde se describa los servicios de educación especial que se ofrecerán.

   vi. Enseñe en el ambiente menos restrictivo.

b. **La identificación de una localización** donde se tiene disponible la alternativa de ubicación recomendada. La localización es la escuela pública, donde se tenga la alternativa de ubicación recomendada, que esté más cercana al lugar de residencia del estudiante.[15]

El Manual provee, además, la descripción de varias alternativas de ubicación conforme a la sección 300.115 de la Ley IDEA, estas son: salón regular, salón especial, escuela especial, hogar, hospital e institución[16]. En lo pertinente, describe un salón regular como aquel en el cual estudiantes con y sin discapacidades reciben su educación. El currículo es regular, los estudiantes compiten para ser promovidos de grado por medio de la otorgación de notas parciales y finales. Existen dos modelos educativos bajo la anterior alternativa de educación:

---

[15] Sección 8.2 del *Manual de Procedimientos de Educación Especial,* págs. 80-81.
[16] Sección 8.1(a) del *Manual de Procedimientos de Educación Especial,* pág. 81.

i. **Salón regular con servicios relacionados –** alternativa de ubicación donde el estudiante es educado junto a estudiantes sin discapacidad y recibe servicios relacionados de parte del programa de educación especial.

ii. **Salón regular con servicios suplementarios –** alternativa de ubicación donde el estudiante es educado junto a estudiantes sin discapacidad y recibe servicios de un maestro recurso (integrado de forma parcial o total), maestro de educación física adaptada, maestro especialista en ciegos o sordos, asistencia tecnológica y/o servicios de un asistente. Esta alternativa incluye los modelos de matrícula reducida e inclusión.[17]

De otro lado, le corresponde al Departamento de Educación realizar un análisis sobre las alternativas de ubicación apropiada conforme al PEI. La localización de alternativas de ubicación "es el proceso que realiza el funcionario del COMPU que representa al DEPR y a la ORE para identificar las escuelas donde se tiene disponible la alternativa de educación recomendada en el PEI". Cuando el Departamento de Educación no tiene disponible la alternativa de educación recomendada en el PEI, este podrá determinar identificar una escuela privada para comprar el servicio educativo a costo público. La determinación de aprobar o rechazar una compra de servicios educativos le corresponde al Secretario Asociado de Educación Especial.[18] La alternativa de ubicación y localización recomendada deberá presentarse en la reunión con el COMPU. Tanto los padres como los miembros del COMPU pueden solicitar conocer las localizaciones presentadas con el propósito de disipar dudas o inquietudes antes de su aceptación.[19] De igual forma, los padres podrán presentar una propuesta de una escuela privada de su predilección. Deberá entregar dicha propuesta al FDEE IV que estuviera trabajando la consulta. La propuesta será evaluada por el Secretario de Educación Especial, pero no

---

[17] Sección 8.1(2)(a) del *Manual de Procedimientos de Educación Especial*, pág. 82.
[18] Sección 8.3 del *Manual de Procedimientos de Educación Especial*, págs. 90-91.
[19] Sección 8.4 del *Manual de Procedimientos de Educación Especial*, pág. 94.

constituirá un compromiso de parte del Departamento de Educación, ni que se le otorgará una compra de servicio o que se aceptará la escuela privada propuesta.[20] Un funcionario de la SAEE asignado podrá realizar un último cotejo de escuelas públicas y las alternativas de ubicación disponibles a nivel Isla, y en la parte d del formulario SAEE-07C podrá:

    i. […]

    ii. Ofrecer recomendaciones de localizaciones disponibles en el DEPR que pudieron ser pasadas por alto y que deben ser consideradas; o

    iii. Pasar la consulta al Secretario Asociado de Educación Especial para evaluar si es o no necesario comprar el servicio educativo en una escuela privada e identificar escuelas privadas cercanas al lugar de residencia del estudiante que tiene la alternativa de ubicación recomendada.[21]

El Secretario Asociado de Educación Especial es el único funcionario del Departamento de Educación con la potestad de aceptar o denegar cualquier consulta para comprar el servicio educativo en una escuela privada. Los funcionarios escolares, facilitadores docentes de educación especial y los directores de CSEE pudiesen solicitar la consulta para la ubicación, pero no tendrán la facultad para determinar que se procederá con una compra de servicios.[22] Por otro lado, la Ley Federal dispone que en las instancias en las que el Departamento de Educación no pueda ofrecerle los servicios educativos apropiados que el estudiante necesite en el sector público, este podrá comprar en el sector privado tales servicios educativos. 20 USC 1412 (A)(10)(B).

El precitado estatuto también dispone lo siguiente:

**(B) Children placed in, or referred to, private schools by public agencies**

    **(i)  In general**

        Children with disabilities in private schools and facilities are provided special education

---

[20] Sección 8.4 del *Manual de Procedimientos de Educación Especial*, pág. 96.
[21] Sección 8.4 (12) del *Manual de Procedimientos de Educación Especial*, pág. 97.
[22] Sección 8.4 (13) del *Manual de Procedimientos de Educación Especial*, pág. 98.

and related services, in accordance with an individualized education program, at no cost to their parents, if such children are placed in, or referred to, such schools or facilities by the State or appropriate local educational agency as the means of carrying out the requirements of this subchapter or any other applicable law requiring the provision of special education and related services to all children with disabilities within such State. 20 USC 1412 (B)(i).

El Manual de Procedimientos de Educación Especial, también provee que, si los padres objetan que el estudiante fuese ubicado conforme al PEI, cualquiera de las partes podrá solicitar una mediación previa a través del formulario SAEE-22 o solicitar una querella administrativa, con el formulario SAEE-23. Tal posibilidad no podrá ser utilizada cuando se trate de la ubicación inicial.[23]

Dispone también la Ley Federal que, cuando se haya recibido una querella al amparo de las secciones (b)(6) o (k)[24], los padres o la agencia educativa envuelta en la querella tendrán la oportunidad de una vista imparcial que cumpla con el debido proceso de ley. 20 USC 1415 (f)(1)(A). La decisión del juez administrativo se apoyará en fundamentos sustantivos basados en la determinación de si el menor recibió una educación pública, gratuita y apropiada. 20 USC 1415 (f)(3)(E)(i).

Cónsono con lo anterior, dispone nuestra *Ley de Servicios Educativos Integrales para Personas con Impedimentos*[25], que los padres de los niños con impedimentos tendrán derecho a:

(A)  Solicitar y recibir orientación por parte de cada agencia pertinente sobre las disposiciones de las leyes estatales y federales relacionadas con la condición de la persona con impedimentos y los procesos de identificación, evaluación, diseño del programa o plan individualizado de servicios, ubicación y debido proceso de ley.

(B) Solicitar, a nombre de la persona con impedimentos, los servicios disponibles en las diversas

---

[23] Sección 8.4 (16) del *Manual de Procedimientos de Educación Especial*, pág. 98.
[24] K- Placement in alternative educational setting.
[25] Artículo 4, 18 LPRA sec. 1353 (b)(2).

agencias gubernamentales para las cuales ésta sea elegible.

(C) Tener acceso a los expedientes, las evaluaciones y otros documentos relacionados con sus hijos con impedimentos, de acuerdo [con] las normas establecidas. [...].

(D) Radicar querella para solicitar reunión de mediación o vista administrativa, en caso de que la persona con impedimentos no esté recibiendo una educación apropiada, en el ambiente menos restrictivo y de acuerdo a los arreglos de servicios contenidos en el P.I.S.F.,[26] P.E.I. o P.I.E.R.,[27] según sea el caso.

(E) Que las decisiones relacionadas con la identificación, evaluación, ubicación e intervención que afecten a la persona con impedimentos, se tomen en todo momento con su aprobación y consentimiento, a menos que respondan a la decisión de un tribunal.

(F) Que cualquier objeción de parte de éstos sea considerada diligentemente al nivel correspondiente, incluyendo aquellos casos cuyas circunstancias particulares ameriten determinaciones a nivel estatal, o en el foro pertinente.

Es decir, tanto IDEA como la Ley Núm. 51-1996, *supra*, le proveen a los padres o tutores que entiendan que los servicios ofrecidos no son apropiados o no van acorde con las necesidades especiales del menor, la opción de presentar una querella y solicitar una vista administrativa ante un oficial examinador imparcial. *Orraca López v. ELA*, supra, pág. 42.

El Departamento de Educación deberá garantizar que la determinación de la alternativa de ubicación del estudiante con discapacidades, sea tomada por el COMPU debidamente constituido, a base del PEI redactado y de conformidad con el principio de la alternativa menos restrictiva, conforme a lo dispuesto en la sección 300 114-120 del reglamento de la Ley IDEA. Ello incluye los casos en que se considera la ubicación del estudiante en una escuela o facilidad privada. Al analizar las posibles ubicaciones para implementar el PEI desarrollado, el COMPU deberá hacerlo

---

[26] Plan Individualizado de Servicios a la Familia.
[27] Programa Individualizado Escrito de Rehabilitación.

mientras respeta las necesidades del estudiante, los recursos, las facilidades existentes y la viabilidad en cada alternativa de educar al estudiante junto a otros que no tienen discapacidades.[28]

Ahora bien, existen instancias donde los padres ubican a los estudiantes en escuelas privadas. En particular, el *Manual de Procedimientos de Educación Especial* dispone que, un niño se considera ubicado por sus padres cuando **el Departamento de Educación tiene y ha ofrecido una alternativa de ubicación y una localización pública donde implementar el programa educativo individualizado** y los padres, aun así, deciden que la educación será provista por una escuela privada. (*Énfasis suplido.*) Tal acto constituye un rechazo de la alternativa de ubicación pública, gratuita y apropiada y su localización.[29]

De otra parte, cabe destacar que, **como norma general, la Ley Federal no requiere que se pague por los costos de educación y otros servicios relacionados en una institución privada, si la agencia encargada puso a la disposición del estudiante una educación pública y apropiada y los padres optaron por la alternativa privada**. 20 USC 1412 (a)(10)(C)(i). (*Énfasis suplido*)

Ahora bien, **la excepción a esta norma general** es la siguiente, **procede el reembolso de estos gastos cuando un Tribunal o Juez Administrativo determina que la agencia no cumplió con la obligación de proveer una educación pública, apropiada, gratuita de manera oportuna ("in a timely manner")**[30] **y la escuela privada en la cual este fue ubicado resulta**

---

[28] Sección 8.5 del *Manual de Procedimientos de Educación Especial*, pág. 99.

[29] Sección 9.1 del *Manual de Procedimientos de Educación Especial*, pág. 101.

[30] En Puerto Rico, el Artículo 4 de la Ley Núm. 51, *supra*, dispone que toda persona con impedimento tendrá derecho, entre otros: de "[s]er evaluadas y diagnosticadas con prontitud por un equipo multidisciplinario, que tome en consideración sus áreas de funcionamiento y necesidades, de modo que pueda recibir los servicios educativos y relacionados indispensables para su educación de acuerdo al programa educativo individualizado para el desarrollo óptimo de sus potencialidades". 18 LPRA sec. 1353(5).

**beneficiosa para este**. 20 USC 1412 (a)(10)(C)(ii); 34 CFR 300.148 (c). (*Énfasis suplido*). En cuanto a los beneficios educacionales en la escuela privada, la Corte Suprema de los Estados Unidos dispuso lo siguiente:

> Accordingly, "when a public school system had defaulted on its obligations under the Act, a private school placement is 'proper under the Act' if the education provided by the private school is 'reasonably calculated to enable the child to receive educational benefits.'" *Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7, 11 (1993), citando a: *Board of Ed. of Hendrick Hudson v. Rowley*, 458 U.S. 176, 207, 73 L. Ed. 2d. 690, 102 S. Ct. 3034 (1982).

El reembolso requiere que el Estado pague aquellos gastos que debieron ser pagados y sostenidos en primera instancia si se hubiese preparado un PEI adecuado. *School Committee v. Dept. of Educ,* supra, págs. 370-371. El Máximo Foro Federal dispuso que, del historial legislativo surgió tal requerimiento:

> "If a parent contends that he or she has been forced, at that parent's own expense, to seek private schooling for the child because an appropriate program does not exist within the local educational agency responsible for the child's education and the local educational agency disagrees, that disagreement and *the question of who remains financially responsible* is a matter to which the due process procedures established under [the predecessor to § 1415] appl[y]." S.Rep. No. 94–168, p. 32 (1975), U.S.Code Cong. & Admin.News 1975, pp. 1425, 1456; *Sch. Comm. Of Town of Burlington, Mass. V. Dep´t of Educ. Of Mass,* supra, pág. 371.

Con relación al reembolso de los gastos, la sección (iii) de la antes referida sección, denominada como "Limitation on reimbursement", enumera los siguientes casos en que el Tribunal o Juez Administrativo puede reducir o denegar el reembolso: (1) si en la más reciente reunión para discutir el PEI los padres no informaron a la agencia su inconformidad con el plan propuesto y su determinación de matricular al estudiante en una institución privada; (2) si diez días laborables antes de matricular al estudiante en una institución privada los padres no notificaron por escrito a la agencia la información descrita en el párrafo (aa), es decir, si no

informaron por escrito su inconformidad con la ubicación propuesta y su decisión de matricular al niño en una escuela privada; (3) si con anterioridad a la remoción del estudiante de la escuela pública, la agencia notificó a los padres que el niño sería evaluado, pero los padres no permitieron que dicha evaluación se realizara y (4) si un tribunal determina que la actuación de los padres fue irrazonable. 20 U.S.C. sec. 1412(a)(10)(C)(iii).

Por último, la agencia también será responsable de sufragar los costos de educación de los niños con impedimentos en una institución privada a los cuales se les proveen educación especial y otros servicios relacionados de conformidad con el PEI, si la agencia consintió a que el niño con impedimento fuese referido a una agencia privada o si el estudiante con necesidades especiales es ubicado por la propia agencia educativa en una institución privada. 20 USCA sec. 1412 (a)(10)(B)(i).

Esbozada la normativa jurídica, procedemos a aplicarla al caso de epígrafe.

**III**

En su primer señalamiento de error, la parte recurrente sostiene que, el foro administrativo incidió al resolver que no procede la compra de servicios solicitada ante la falta de una alternativa de ubicación en el mercado público.

Como segundo señalamiento de error, la parte recurrente aduce que, el foro administrativo erró al no resolver que las alternativas de ubicación propuestas por la parte recurrida no satisfacen las necesidades particulares de la menor SPPM.

La parte recurrente, como tercer señalamiento de error sostiene que, el foro administrativo incidió en su apreciación de la totalidad de la prueba oral, pericial y documental presentada en la vista administrativa al obviar la evidencia sobre las necesidades particulares de la menor, sobre la necesidad de alternativa de

ubicación propuesta, la alternativa privada propuesta y sobre el derecho a compra de servicio solicitada.

En su cuarto señalamiento de error, la parte recurrente arguye que, el foro recurrido incidió en su aplicación del derecho en el caso de epígrafe, particularmente, en lo dispuesto en los casos *School Comittee of the Town of Burlington v. Department of Education*, supra y *Florence County v. Carter*, supra, sobre la obligación del Departamento de Educación de proveer a la menor una alternativa de ubicación apropiada.

Por estar intrínsecamente relacionados, se discutirán los errores de forma conjunta.

Según reseñáramos, la menor SPPM se encuentra registrada en el Programa de Educación Especial del Departamento de Educación. De acuerdo al expediente, esta tiene un diagnóstico de trastorno específico de aprendizaje con dificultades en lectura, escritura y cálculo, déficit de atención con hiperactividad y manifestaciones conductuales y emocionales asociadas con tal diagnóstico. Debido a las dificultades que la menor atravesaba, su madre, decidió someterla ante un proceso evaluativo llevado a cabo por la doctora Nannette Negrón. Como resultado de la evaluación la doctora Nannette Negrón preparó un informe de evaluación con recomendaciones de ubicación y de servicios relacionados. Dentro de tales recomendaciones, la doctora Nannette Negrón sugirió que la menor SPPM requería una ubicación en un programa educativo y especializado, con metodología y con currículo dirigido primordialmente al desarrollo y fortalecimiento de destrezas comunicológicas, necesidades sensoriales, manejo apropiado y redirección de conductas maladaptativas y adquisición de destrezas de apresto educativo. Asimismo, sugirió que la ubicación apropiada para la menor debía ser en un grupo de corriente regular, no mayor de seis (6) estudiantes de igual o mayor dominio de destrezas

cognoscitivas, académicas, conductuales, adaptativas y socioemocionales junto a asistente de servicios y en el cual se mantuviese la escritura y rutina necesaria para el proceso educativo de esta. Añadió, además, que la menor necesitaba servicios relacionados y suplementarios como terapias del habla, terapia ocupacional, terapia psicológica, terapia educativa, alimentos escolares, transportación, evaluaciones, reevaluaciones y equipos de asistencia tecnológica.

Se desprende del expediente que, el 8 de agosto de 2023 se llevó a cabo la reunión de COMPU donde asistió la señora Matos Lamourt, la doctora Nannette Negrón y la facilitadora Milián Canales. En dicha reunión se discutió el informe realizado por el estudiante de psicología Delgado Correa y firmado por el doctor Bauzá Henríquez. De igual forma, el Departamento de Educación le hizo tres ofrecimientos de escuelas de corriente regular a la madre de la menor SPPM, para el año escolar 2023-2024, que consistió en las escuelas Julio Sellés Solá, Luis Muñoz Rivera y San Agustín. Posteriormente, la madre de la menor decidió rechazar dichos ofrecimientos, debido a que entendía que no eran alternativas apropiadas que satisficieran las necesidades específicas de la menor SPPM conforme a las recomendaciones de la doctora Nannette Negrón. A tales efectos, matriculó a la menor en el Centro de Desarrollo Infantil AEIOU y presentó la *Querella*.

En su *Querella*, entre otras cosas, sostuvo que, la agencia recurrida únicamente se había limitado a aceptar el informe preparado por la doctora Nannette Negrón para fines de diagnóstico y terapia, y que, ignoró las recomendaciones para efectos de ubicación apropiada. Acotó que, rechazó los ofrecimientos del Departamento de Educación debido a que estos no eran cónsonos con las recomendaciones para la menor de acuerdo a sus necesidades. Adujo que, por motivo de lo anterior, tuvo que ubicar

a la menor en el sector privado, y que ello no podía ser considerado como una decisión unilateral, ya que había sido producto de la falta de una alternativa apropiada en el sistema público. Por ello, entre otras cosas, solicitó la compra de servicios educativos relacionados y suplementarios para la menor, para el año escolar 2023-2024 y siguientes, hasta tanto la agencia recurrida ofreciera una ubicación apropiada que satisficiera sus necesidades. Solicitó, además, el reembolso de toda suma invertida en el sector privado, incluyendo servicios educativos, relacionados y suplementarios desde que la menor fue determinada elegible al Programa de Educación Especial hasta que la agencia cumpliera con sus responsabilidades a tales fines.

Posteriormente, la parte recurrida presentó la *Contestación a Querella*. Luego de varias incidencias procesales innecesarias pormenorizar, el Departamento de Educación presentó la *Enmienda a Contestación a Querella*. En esencia, adujo que, la madre de la menor SPPM no visitó las escuelas ofrecidas por el Departamento de Educación, que rechazó las mismas, y que, unilateralmente matriculó a la menor en la institución privada, Centro de Desarrollo Infantil AEIOU. Alegó, además que, lo anterior conllevaba una violación al término de diez (10) días disponibles para el Departamento de Educación realizar otros ofrecimientos. Asimismo, expresó que, debido a que la señora Matos Lamourt no había notificado oportunamente el haber ubicado a la menor en AEIOU, no tenía derecho al pago de los servicios educativos para el año escolar 2023-2024.

El 5 de octubre de 2023, fue celebrada la vista administrativa. En esta se presentaron los testimonios de la doctora Nannette Negrón, la señora Dana Bobadilla, la señora Matos Lamourt y la señora Milián Canales.

La primera en testificar fue la doctora Negrón, quien es una psicóloga con especialidad en autismo y asistencia tecnológica[31]. En esencia, su testimonio consistió en la evaluación realizada a la menor SPPM, sus hallazgos y recomendaciones. Añadimos parte de su testimonio relevante a la controversia de este caso. Veamos.

> R    Mi nombre es la doctora Nannette Negrón. Yo me dedico a realizar evaluaciones, verdad. Mayormente, para el noventa y nueve por ciento de mi práctica privada es de evaluación con niños con autismo, problemas de aprendizaje, déficit de atención o discapacidad intelectual. Ese es mi, verdad, mi área de peritaje en términos de lo que es evaluación para niños, adolescentes y adultos.

> P    Le pregunto si usted conoce a la estudiante [SPPM].

> R    Sí, la conozco en mi carácter profesional. Verdad, le he realizado en dos ocasiones. Tan reciente la última vez para una evaluación psicológica el pasado 2 y 3 de agosto del año presente.[32]

> P    […] [e]xplíquele a este foro en qué consistió el proceso evaluativo que usted llevó a cabo con esta menor.

> R    Pues en esta menor, verdad, se realizaron diferentes tipos de evaluaciones. Evaluamos la parte cognitiva, evaluamos la parte conductual, la parte conductual adaptativa. Incluso, se evaluaron componentes sensoriales. Que es el área que más afecta a la menor actualmente. Y a raíz de todas estas situaciones anteriormente a esta joven se le había realizado una evaluación psicoeducativa. Verdad, en las cuales presentó debilidades en términos académicos, en áreas de lectura, escritura y matemática.[33]

> […]

> R    Y se evidencia, verdad, que la menor cuenta con un diagnóstico de déficit de atención a través de las observaciones clínicas, y protocolos, verdad, estandarizados que se le administraron a los padres y encargados. A raíz de, verdad, de lo que fue el proceso de evaluación se hicieron una serie de recomendaciones. Entre estas, ubicación escolar de la estudiante, una T1, terapia psicológica, terapias educativas y un grupo, verdad, de trabajo que incluya todo eso dentro del ámbito escolar.[34]

> […]

---

[31] Transcripción de la Prueba Oral (TPO) de 5 de octubre de 2023, línea 9, pág. 7.
[32] TPO de 5 de octubre de 2023, líneas 7-22, pág. 14.
[33] TPO de 5 de octubre de 2023, pág. 16, líneas 11-24.
[34] TPO de 5 de octubre de 2023, pág. 17, líneas 1-9.

P        Está bien. Gracias. Doctora, vamos a ir a las observaciones conductuales que usted hizo de esta menor.

R        Bueno, la joven actualmente, verdad, tiene un nivel alto de hiperactividad, bastante ansiedad, tiene problemas para comunicarse adecuadamente, tiene problemas de atención, tiene problemas de adaptación, incluso también.[35]

P        Okey. Entonces, vamos a las pruebas estandarizadas. Hábleme brevemente qué mide cada una de las pruebas estandarizadas que usted administró y háblenos del resultado.

R        por ejemplo, la (ininteligible) es una prueba de inteligencia no verbal y la joven obtuvo un coeficiente intelectual de ciento tres. Que la ubica dentro de una[36] clasificación promedio. La próxima, también se le administró una prueba visomotora, en la cual obtuvo un coeficiente, verdad, que la ubica dentro de una clasificación promedio bajo en comparación a otros jóvenes de su misma edad.

A nivel de lo que es la BASC, lo que es la BASC. Lo que mide la BASC es... Nos ayuda a determinar si la menor presenta algún tipo de diagnóstico, ya sea de déficit de atención o hiperactividad o ansiedad. En el caso de lo que... de los indicadores emocionales encontrados dentro de esta evaluación para la hiperactividad, ansiedad, problemas en la comunicación funcional y problemas de atención, incluyendo también dentro, verdad, que podemos observar en la página 4 que hay marcadores en problemas, verdad, dentro de riesgo en problemas de adaptación. Más adelante...

P        ¿A qué se refiere usted a que hay riesgos en problemas de adaptación?

R        Hay riesgos porque la curva de la prueba la marca en el límite de que tenemos problemas para adaptarnos a los cambios. Verdad, y se puede evidenciar más abajo en las escalas Vineland que miden el nivel adaptativo de la joven. Dentro de los niveles adaptativos de la joven se encuentra dentro de un promedio moderadamente bajo. Esto va de bajo a moderadamente bajo y adecuado.[37]

En términos generales esta joven a nivel de, de comunicación de acuerdo a las contestaciones y respuestas de los padres encargados en la página 8 podemos observar que a nivel receptivo todavía [SPPM] y expresivo presenta un nivel adaptativo bajo equivalente a una niña de dos años y dos meses y dos con ocho. La niña tenía...

---

[35] TPO de 5 de octubre de 2023, pág. 17, líneas 12-18.
[36] TPO de 5 de octubre de 2023, pág. 17, líneas 19-25.
[37] TPO de 5 de octubre de 2023, pág. 18, líneas 1-24.

P       ¿Qué edad tenía la niña cuando usted la evaluó?

R       La joven tiene actualmente siete añitos.

P       Okey. Entonces, ¿qué, qué resultados tendría con el proceso adaptativo esta niña de que ella esté ejecutando el proceso [...] adaptativo a nivel del resultado de una prueba estandarizada a nivel de dos años cuando tiene siete años de edad?

R       Es correcto. Y a nivel académico todavía se encuentra en unos niveles muy bajos de acuerdo a su edad. **Entiendo que lo más que está impactando actualmente a [SPPM] es la mala ubicación académica**. Verdad, que **necesitamos una ubicación que esté atemperada a manejar todas sus necesidades a nivel general**, tanto fortalecer sus destrezas comunicativas tanto verbal y como no verbales, al igual que adaptativas también.[38]

P       [...] ¿qué, qué efecto pudiera tener para una niña de siete años que su nivel adaptativo esté al nivel de una niña de dos años? ¿Cu[á]les serían los riesgos que eso pudiera representar?

R       Bueno, una razón para ella también es el funcionamiento académico, sino para sus pares de su misma edad. **El no tener una ayuda adecuada y una ubicación adecuada para una niña de esta edad los efectos y la prognosis es adversa totalmente**. Ella necesita ayuda de forma integral. Verdad, integrativa, tanto que estén los componentes no tan solo de maestros, también tener todas las terapias en un solo lugar.

P       Okey. Entonces, vamos a... en el área, en los niveles de dominio. Estoy en la página 8 de su informe. Doctora, si nos puede interpretar...

R       Unjú.

P       ... esas gráficas, esas tablas en la página 8, por favor.

R       Claro que sí. Esa fue la primera que le hablé de la parte de comunicación y las áreas receptivas. En términos de comunicación estamos equivalentes a una. . . en la parte receptiva de una niña de dos años y dos meses, expresiva de dos con ocho, escrito de cuatro con diez. A nivel de las destrezas del diario vivir, pues a nivel personal, pues estamos con una edad equivalente de cuatro con diez, a nivel doméstico bajo una niña de seis años y a nivel de cómo ella se relaciona en sus relaciones interpersonales con la comunidad es una chica de cuatro años y seis meses. [39]

A nivel social sus relaciones interpersonales l[a] ubican dentro de una edad equivalente de seis años con

---

[38] TPO de 5 de octubre de 2023, pág. 19, líneas 1-21.
[39] TPO de 5 de octubre de 2023, pág. 20, líneas 2-25.

un nivel adecuado. A nivel de juegos y destrezas, de copiar otras destrezas ahí estamos en un nivel adaptativo de una niña de cuatro años y tres años y cuatro meses. A nivel de destrezas motoras estamos en un nivel grueso adecuado y a nivel fino, de motor fino a nivel adecuado a una niña de cinco con seis. A nivel general esta conducta adaptativa se encuentra dentro de una clasificación moderadamente bajo.

P     Okey. Entonces, en términos de diagnósticos, ¿cuáles son los diagnósticos que usted ha validado como parte del proceso evaluativo que usted llevó a cabo?

R     Un trastorno específico del aprendizaje con dificultades en lectura, expresión escrita y dificultad matemática y el déficit de atención con hiperactividad tipo combinado.

P     ¿Qué significa tipo combinado?

R     Tanto podemos ser hiperactivos, como podemos ser inatentos.

P     Okey. ¿A la luz de su proceso evaluativo qué es lo que usted recomienda en términos de ubicación escolar? Explíquenos qué exactamente es lo que usted considera una ubicación apropiada para esta niña?[40]

R     Pues un **grupo de corriente regular no mayor a seis estudiantes de igual o mayor funcionamiento**, verdad, en términos de sus destrezas de comunicación, cognitiva, conductual, adaptativa y socio emocional.

P     ¿Por qué ese número de estudiantes, doctora?

R     porque la joven trabaja mejor en grupos pequeños.

P     ¿Qué pasaría si yo ubico a esta niña en un grupo regular cuya cantidad de estudiantes exceda esa cantidad que usted está recomendando?

R     No tendríamos ningún cambio significativo porque a nivel adaptativo estamos con una edad equivalente en muchas áreas de una chica, de una joven de dos años, dos años y cuatro meses o de cuatro añitos.

P     Okey. ¿Qué otras recomendaciones usted hace como parte de su proceso evaluativo?

R     Pues yo recomiendo una T1 también.

P     ¿Por qué?

R     Para que la ayude a enfocarse, a mantenerse sentada, ayudar en sus procesos de atención, concentración, la puede redirigir, la ayude, le dé

---

[40] TPO de 5 de octubre de 2023, pág. 21, líneas 1-25.

dirección constante. Que es lo más que necesita [SPpPM].

P        ¿En términos de su proceso terapéutico qué, si algo, usted recomienda?

R        Yo recomendaría terapia psicológica dos veces por semana para ayudarle a manejar tal vez sus conductas,[41] ayudarle a manejar sus niveles de ansiedad y demás.

P        Mencionaba usted que los servicios sean integrados. ¿A qué usted se refiere con eso?

R        Lo ideal, verdad, sería que ella reciba todos los servicios de manera interdisciplinaria dentro del mismo ambiente académico. Verdad, para mayor beneficio de la menor también recomendaría unas terapias educativas para reforzar las áreas de lectura, escritura y matemática con una frecuencia de tres veces por semana de manera individual por cuarenta y cinco minutos.

P        Usted indica que esta niña ya ha sido previamente evaluada. Háblenos de esas evaluaciones. Si usted tuvo la oportunidad de examinarlas, ¿qué fue lo que. . . lo que usted encontró de esas evaluaciones previas que usted haya tenido oportunidad de evaluar.

R        Bueno, se evidencia que está en un nivel adaptativo bien bajo. En el 2022 tuve la oportunidad de evaluar a [SPPM] y dentro de esa misma evaluación ella se encontraba con un nivel académico de Kínder. Y ella no ha presentado ninguna... ningún avance desde entonces.[42]

[…]

P        ¿Y cuál es su opinión pericial sobre una corriente regular típica como la que ella estaba?

R        Que no le van a brindar los servicios que necesita porque actualmente un grupo de más de seis estudiantes y sin tener esa ayuda individualizada continuaríamos. . . nos quedaríamos estáticos en el mismo lugar porque no tiene esa ayuda individualizada. Que es la que ella necesita. Y un "one to one" para ella sería muy restrictivo.

P        Okey. O sea, ¿Qué no, no puede ser ni un "one to one", verdad, porque es muy restrictivo ni un grupo mayor de seis porque también afectaría su proceso educativo? ¿Esa es su opinión?

R        En mi opinión personal.

P        ¿En términos emocionales qué pasaría con [SPPM]? ¿En términos socioemocionales qué pasaría

---

[41] TPO de 5 de octubre de 2023, pág. 22, líneas 1-25.
[42] TPO de 5 de octubre de 2023, pág. 23, líneas 2-20.

con [SPPM] si […] no la ubica o si no tenemos una ubicación apropiada para ella?

R        Los niveles de ansiedad aumentarían más de lo que están. Verdad, a nivel emocional la joven está, verdad, está comprometida tanto que niveles de ansiedad altos, un alto nivel de actividad motora. O sea, se exacerbaría.[43]

[…]

P        Si yo le dijera que lo que tenemos disponible para esta niña es un grupo de doce estudiantes cuál sería su opinión sobre esa alternativa. . .

[. . .]

R        Yo, verdad, de verdad en mi humilde opinión, es una recomendación, no es lo que le convendría. A ella le conviene un grupo menor.

[. . .]

R        No le conviene porque [SPPM] es muy impulsiva, le cuesta trabajo mantenerse sentada, ha presentado conductas disruptivas y ella necesita grupos pequeños. No a nivel tan descriptivo como "one to one", pero sí grupos pequeños. Y un grupo de más de seis estudiantes sería perjudicial para ella. Ella se desenfoca con mucha facilidad.[44]

A preguntas de la representación legal del Departamento de Educación, la doctora Nannette Negrón reiteró que, entre sus recomendaciones se encontraba que la estudiante SPPM estuviese en un salón regular de seis (6) estudiantes con un asistente de servicio[45].

En la vista desfiló, además, el testimonio de la señora Dana Bobadilla, Directora del Centro de Desarrollo Infantil AEIOU. A preguntas de la representación legal de la parte recurrente, la señora Dana Bobadilla respondió que, el Centro de Desarrollo Infantil AEIOU era una escuela de corriente regular donde trabajaban en inclusión con niños de diversidad.[46] De igual modo, añadió que, al momento AEIOU contaba con la licencia del Consejo General de

---

[43] TPO de 5 de octubre de 2023, pág. 24, líneas 3-23.
[44] TPO de 5 de octubre de 2023, pág. 27, líneas 3-5; 14-16 y 19-25.
[45] TPO de 5 de octubre de 2023, pág. 29, líneas 9-19.
[46] TPO de 5 de octubre de 2023, pág. 34, líneas 6-9.

Educación y la licencia del Departamento de la Familia[47].   Respecto a si AEIOU tenía alguna relación contractual con el Departamento de Educación, esta respondió que, al momento se encontraban en un proceso, pero aún no se había firmado el contrato[48].  Añadió que, se habían realizado unas propuestas para llevar a cabo un contrato. Declaró que estas habían sido discutidas y se encontraba en espera de que el Departamento de Educación se contactara y enviara una documentación para proceder[49].  Asimismo, atestiguó que, se había preparado una propuesta de servicio para la menor SPPM[50]. Según describió la señora Dana Bobadilla, en la propuesta de servicio para la menor SPPM, propusieron un trabajo individualizado con esta dentro de la corriente regular de grupos pequeños, donde se trabaja según las fortalezas y debilidades[51].  Explicó, además, que, el grupo donde se encuentra la menor SPPM es un grupo de cinco niños, incluyéndola[52].   Atestiguó que, la menor SPPM mostraba gran actividad, que tenía problemas de lenguaje y de lectura.  Así como que, se le estaba trabajando según su nivel, debido a que una niña con problemas específicos de aprendizaje la recomendación nunca es de tener grados, sino que, dentro de sus grados se pueda trabajar en el nivel que ella está[53].  Expresó que, existían periodos donde la menor SPPM se atendía individualmente con el propósito de seguir trabajando con las maestras, específicamente, en el área de la lectura. Aseguró que, contaban con un maestro de Educación Especial que provee asistencia a los maestros para trabajar con los planes individualizados y con las estrategias que se utilizarán con la menor SPPM, así como con una maestra de Educación Especial

---

[47] TPO de 5 de octubre de 2023, pág. 34, líneas 21-25.
[48] TPO de 5 de octubre de 2023, pág. 35, líneas 1-5.
[49] TPO de 5 de octubre de 2023, pág. 35, líneas 8-11.
[50] TPO de 5 de octubre de 2023, pág. 35, líneas 20-23.
[51] TPO de 5 de octubre de 2023, pág. 37, líneas 13-18.
[52] TPO de 5 de octubre de 2023, pág. 37, líneas 15-16.
[53] TPO de 5 de octubre de 2023, pág. 38, líneas 1-3.

de español[54]. Por otro lado, afirmó que, en el equipo de trabajo que trabaja con la menor SPPM, había una maestra de español, estudios sociales y artes, un maestro de matemáticas, inglés y ciencias, una serie de asistentes que ayudan en las distintas áreas, un maestro de Educación Especial recurso y una psicóloga que le provee estrategias a los maestros[55].

Por otra parte, la señora Dana Bobadilla explicó que, en AEIOU el año escolar corría de agosto a junio, debido a que, cuando los estudiantes del centro se separan de la parte académica escolar por dos meses y medio, mostraban mucha regresión[56]. En el caso particular de la menor, que tiene dislexia significativa, sostuvo que, se trabajaba por medio de la repetición y el ofrecimiento de estrategias, y que, al estar tanto tiempo sin clases o sin servicios los estudiantes se rezagaban nuevamente. Es decir, perdían parte de lo adquirido y por eso trataban de cerrar la brecha de tiempo[57].

En cuanto a qué criterios o información se utilizó al momento de preparar la propuesta de servicios para la menor SPPM, la señora Dana Bobadilla expresó que fue la evaluación de la doctora Negrón[58]. Respecto a preguntas sobre cómo era el funcionamiento de la menor, la señora Dana Bobadilla replicó que, su atención era dispersa, le daba mucha dificultad el poder funcionar mecánicamente, pero que, había mostrado progreso y se veía a gusto con el centro[59].

El próximo testimonio fue el de la señora Matos Lamourt. Esta atestiguó que, en el año escolar 2022-2023, la menor SPPM estuvo en el Colegio La Inmaculada en Santurce, en un salón de diez (10) estudiantes[60]. Narró que, la experiencia de la menor en un

---

[54] TPO de 5 de octubre de 2023, pág. 38, líneas 4-12.
[55] TPO de 5 de octubre de 2023, pág. 38, líneas 16-23.
[56] TPO de 5 de octubre de 2023, pág. 41, líneas 5-13.
[57] TPO de 5 de octubre de 2023, pág. 41, líneas. 14-22.
[58] TPO de 5 de octubre de 2023, pág. 41, líneas 23-25; pág. 42, línea 1-2.
[59] TPO de 5 de octubre de 2023, pág. 42, líneas 16-25.
[60] TPO de 5 de octubre de 2023, pág. 60, líneas 22-25; pág. 61, líneas 2-4.

grupo de diez estudiantes fue difícil, y que tuvo grandes dificultades[61]. La madre de la menor aseguró que, previo a la reunión del COMPU de 8 de agosto de 2023, le había enviado por correo electrónico a la facilitadora, la señora Milián Canales el 4 de agosto de 2023, la evaluación preparada por la doctora Nannette Negrón. Sin embargo, explicó que, en la reunión de COMPU, al preguntarle a la facilitadora si había recibido dicha evaluación, la señora Helga Milián respondió en la negativa[62]. Ante ello, la señora Matos Lamourt, confirmó el correo electrónico de la facilitadora y le expresó que le iba a enviar la evaluación nuevamente, y mencionó que, la facilitadora le dijo que eso lo podían atender más adelante[63]. La señora Matos Lamourt añadió que, en la reunión, la señora Milián Canales comenzó con la evaluación realizada por el estudiante de psicología Aníbal Delgado y firmada por el doctor Bauzá[64].

De igual manera, testificó lo siguiente respecto a los ofrecimientos del Departamento de Educación:

> P    Óigame, ¿cuál era su posición? ¿Si el Departamento el día 8 le hubiese ofrecido lo que recomendaba la doctora Nannette Negrón cuál hubiese sido su posición?
>
> R    Pues lo aceptaría y rápidamente porque yo tenía el semestre a punto de empezar encima y yo como madre responsable y con una niña que ya yo sé que tiene un problema y que no se le puede dar espacio a rezagarse más lo hubiera aceptado. Y, y yo no tengo recursos. O sea, ha sido bien. . . Es bien difícil para mí. Así que hubiera sido lo ideal.[65]
>
> Respecto a los ofrecimientos realizados por el Departamento de Educación, la madre respondió lo siguiente:
>
> R    Pues ellos me, me ofrecieron un salón regular con servicio suplementario y, y me dieron tres escuelas. Una de ellas es la. . .

---

[61] TPO de 5 de octubre de 2023, pág. 61, líneas 7-12.
[62] TPO de 5 de octubre de 2023, pág. 77, líneas 2-11.
[63] TPO de 5 de octubre de 2023, pág. 77, líneas 14-20.
[64] TPO de 5 de octubre de 2023, pág. 77, líneas 21-23. Cabe destacar que surge de la TPO que, a la menor SPPM se le realizó una evaluación en el centro SERVIRE por el estudiante de psicología Aníbal Delgado. Véase pág. 66, líneas 1-7.
[65] TPO de 5 de octubre de 2023, pág. 79, líneas 15-24.

[…]

P        ¿Cuáles fueron esas tres escuelas?

R        La Escuela Sellés, la Luis Muñoz Rivera, que ahí estudié yo cuando era niña, la San Agustín.  Esas tres escuelas fueron las que me dieron en ese momento.

P        Okey. ¿Qué hizo usted en relación con esas escuelas?

R        Las visité.[66]

Ahora, respecto a las escuelas visitadas el testimonio de la señora Matos Lamourt es como sigue:

P        […] Vamos a esta primera que es la Julio Sellés Solá. Dígame cuándo la visitó, quién la atendió y qué pasó allí.

R        Pues yo la visité el 15 de agosto y la razón. . . […] la razón por la cual hubo una demora es porque en casa nos enfermamos con el micoplasma. […]

Tan pronto estuvimos bien yo acudí a la escuela y la directora Damaris Concepción muy amablemente me atendió, pero me indicó, pues que ellos lo que trabajan son salones que están sumamente poblados de niños. Y ella me hizo la recomendación.  Ella me dijo, "Mira, la escuelita Amalia Marín ellos puede que tengan lo que tú necesitas" y, y me dio la información. Por eso es que yo vine. . .[67]

Según se desprende de la TPO, en la hoja de visita la directora Damaris Concepción escribió "[l]a señora Matos visita nuestra escuela en busca de matrícula para segundo grado en un grupo regular reducido, lo cual nuestra escuela no cuenta con el mismo. Se refiere a la Escuela Amalia Marín en el Barrio Venezuela donde gestione matrícula y cuenta con terapia del habla, psicología y ocupacional. Damaris Concepción".[68]

[. . .]

P        […] Y cuénteme, ¿qué, si algo, pasó en la Amalia Marín cuando usted la visitó?

R        Pues cuando yo fui, verdad, hablé con, con el director de la escuela […] Y entonces, le, le expliqué que estaba visitando la escuelita por recomendación de, de la señora Damaris Concepción que me lo había referido.

---

[66] TPO de 5 de octubre de 2023, pág. 80, líneas 4-17.
[67] TPO de 5 de octubre de 2023, pág. 8, líneas 22-24; pág. 83, líneas 1-14.
[68] TPO de 5 de octubre de 2023, pág. 83, líneas 17-25; pág. 84, líneas 1-2.

Y entonces, él me explicó que él tenía salón ruta 1 de segundo y tercero disponible con... pero son doce estudiantes.

P       [...] Y entonces, vamos a la Luis Muñoz Rivera. ¿Qu[é] si algo, pasó allí? ¿Cuándo la visitó y qué fue lo que pasó?[69]

R       Pues a la Luis Muñoz Rivera fui el 16, si no me equivoco. Sí el 16 de agosto y ellos, pues me indicaron que los salones de ellos tenían diecinueve estudiantes. Y entonces, de hecho, ellos también me hablaron de la escuelita Amalia Marín. Que buscara eso como alternativa.[70]

En cuanto a la hoja de visita, leyó que, el director de la escuela, el señor José Luis Ríos Rivera, escribió lo siguiente:

"La escuela no cuenta con la alternativa de ubicación según fue recomendada. Grupo pequeño. Se hizo referido a Escuela Amalia Marín, la cual cuenta con una ubicación apropiada. El segundo grado cuenta con dos grupos de diecinueve estudiantes".[71]

[. . .]

P       [...] Vamos entonces a la última que tengo aquí, que es la San Agustín.

R       A esa fue a la, la última que fui y allí, pues me atendió el director Víctor Lebrón.

P       ¿Qué pasó allí?

R       Pues él me indicó que él no tenía disponible los, los, verdad, lo que estaba... lo que yo estaba buscando. Ellos tenían salones con muchos niños.

P       [...] Entonces, ¿luego de usted haber visitado esas tres escuelas que le ofrece el Departamento y esa otra que usted se entera porque también se la recomiendan dos de los directores que usted visitó, qué usted hizo con la información que usted obtiene de esas cuatro visitas?

R       Pues entonces, yo llego a la conclusión de que no estaba encontrando lo que... lo que la nena necesita porque no fui a tres, fui a cuatro, y ya no me habían recomendado más nada. O sea, que si ellos me hubieran... Igual amablemente me pudieron hablar de Amalia Marín, pero yo estaba como que ya no tenía más, más recursos. Y entonces, pues yo le envié el 17 de agosto...

---

[69] TPO de 5 de octubre de 2023, pág. 85, líneas 12-24.
[70] TPO de 5 de octubre de 2023, pág. 86, líneas 1-5.
[71] TPO de 5 de octubre de 2023, pág. 86, líneas 12-16.

[…]

R    …que es el próximo día, una carta a la… a la señora Milián donde le explicaba, pues que tenía que rechazar esos… esas, esas… esos ofrecimientos que ella me hizo porque no cumplían, verdad, con las necesidades de lo que la… de lo que la niña requiere.[72]

Igualmente, la señora Matos Lamourt aseguró que, le envió la carta a la señora Milián Canales mediante correo electrónico, donde le explicó la visitas a las escuelas y que, ninguna satisfacía las necesidades de la menor SPPM.[73]  Añadió que, en la carta notificó que, por tal razón, se veía obligada a rechazar las alternativas y que, entendía que, no le quedaba más alternativa que ubicar a la menor en el sector privado y radicar la correspondiente querella. Asimismo, indicó que, si la escuela Luis Muñoz Rivera hubiese tenido la alternativa de ubicación recomendada por la doctora Nannette Negrón la hubiese aceptado inmediatamente.[74]

La madre de la menor SPPM sostuvo, además que, hubo una reunión del COMPU el 23 de agosto de 2023, posterior a haber matriculado a la menor en AEIOU, que fue el 21 de agosto de 2023.[75]

Finalmente, fue presentado el testimonio de la facilitadora del Departamento de Educación, la señora Milián Canales, que consistió en lo siguiente:

P    Y le pregunto, ¿cómo es ese proceso de determinación de elegibilidad? ¿Cómo se hace?

R    Ese proceso de determinación de elegibilidad se hace un, un análisis de problema existente. Entiéndase una (ininteligible). Que es las observaciones de los maestros de la sala de clases. Se toma en consideración lo que es su historial social, lo que son las evaluaciones, verdad, que hay al momento, ya sea privada o ya sea realizado por el Departamento de Educación.[76]

---

[72] TPO de 5 de octubre de 2023, pág. 87, líneas 1-25; pág. 88, línea 1.
[73] TPO de 5 de octubre de 2023, pág. 88, líneas 12-25; pág. 89, líneas 81-10, 23-25; pág. 90, líneas 1-2.
[74] TPO de 5 de octubre de 2023, pág. 90, líneas 2-17.
[75] TPO de 5 de octubre de 2023, pág. 91, líneas 2-5.
[76] TPO de 5 de octubre de 2023, pág. 119, líneas 17-25.

La señora Milián Canales expresó que, en el momento de la determinación de elegibilidad había una evaluación del doctor Iván Bauzá Henríquez y que era la única evaluación en el expediente.[77]

P        ¿Posterior a ello se entregó alguna otra evaluación?

R        Después de haber, verdad, discutido la evaluación del doctor Bauzá es que se hace la determinación que se comienza hacer lo que es el PEI, verdad, el (inaudible) del PEI. Madre, verdad, menciona y envía un correo electrónico con la evaluación de la doctora Nannette Negrón posterior, verdad, a esa determinación.

P        ¿Y ese día en esa reunión, y en esa misma reunión la madre le habla que existe una evaluación de la doctora Nannette Negrón?

R        Es correcto.

P        ¿Y la evaluación de la doctora Nannette Negrón tiene unas recomendaciones que son distintas a las del informe de Bauzá?

R        Es correcto.

P        Es correcto. Y ustedes no tomaron en consideración para hacer los ofrecimientos las recomendaciones de la doctora Nannette Negrón, ¿verdad que no?

R        Se tomaron algunas. Se tomaron algunas recomendaciones que no son determinaciones. Es correcto.

P        Óigame, las recomendaciones del doctor Bauzá tampoco son determinaciones…

R        Es correcto.

P        …¿verdad que no?

R        Es correcto.

P        ¿Y a ustedes les pareció mejor la del doctor Bauzá que la de la doctora Nannette Negrón?

R        No es que nos pareció mejor. Como especialista en la evaluación…

[…]

P        Óigame, ¿ustedes rechazaron la recomendación de ubicación de la doctora Nannette Negrón?

---

[77] TPO de 5 de octubre de 2023, pág. 120, líneas 15-23.

R　　Se rechazó solamente el área donde dice la cantidad de estudiantes.[78]

[…]

P　　¿Usted leyó los resultados de las evaluaciones de la doctora Nannette Negrón?

R　　Es correcto. Se leyeron con mamá y con la … y con la psicóloga en la misma reunión. Es correcto.[79]

Luego de atendida la vista, y de que las partes presentaran sus respectivos memorandos de derecho, el foro recurrido emitió la *Resolución Final* cuya revisión nos ocupa, donde concluyó que se constituyó una ubicación unilateral conforme la Ley IDEA. Conforme a lo anterior, declaró No Ha Lugar la *Querella.*

De acuerdo al derecho reseñado, el derecho a la educación tiene rango constitucional en Puerto Rico[80]. En particular, nuestra Constitución en su Artículo II, Sec. 5 dispone que, toda persona tiene derecho a una educación que propenda al pleno desarrollo de su personalidad y al fortalecimiento del respeto de sus derechos y de las libertades fundamentales[81]. Con esto como base, tanto nuestra Legislatura, como la Legislatura Federal implementaron leyes respecto al derecho a la educación de personas con discapacidades.

En particular, la ley federal IDEA, tiene como propósito el asegurar que los niños y las niñas con discapacidades reciban una educación pública, apropiada, gratuita y que atienda las necesidades especiales de cada estudiante; que los derechos de los menores con discapacidades y sus padres sean protegidos, y evaluar y asegurar la efectividad de los esfuerzos para educarlos.[82] Con este fin, provee múltiples requisitos sustantivos y procesales.[83] En

---

[78] TPO de 5 de octubre de 2023, pág. 138, líneas 7-25; pág. 139, líneas 1-9.
[79] TPO de 5 de octubre de 2023, pág. 140, líneas 22-25.
[80] *Declet Ríos v. Departamento de Educación*, supra, pág. 773; *Orraca López v. ELA*, supra, pág. 40.
[81] Constitución del Estado Libre Asociado de Puerto Rico, LPRA, Tomo 1, ed. 1982.
[82] Ley Púb. Núm. 108-446, 20 USCA sec. 1400(d)(1), (2) y (4).
[83] *Declet Ríos v. Departamento de Educación*, supra*,* a la pág. 777.

cuanto a la ley estatal, la Ley Núm. 51-1996, *supra*, ratifica el derecho de las personas con impedimentos a recibir una educación pública, gratuita y de acuerdo a sus necesidades, que le permita desarrollarse plenamente y convivir con dignidad en la comunidad de la que forman parte. Con este propósito se establecen claramente las responsabilidades y funciones de todas las agencias que deben brindar servicios especializados y profesionales directos o relacionados a este sector de la población.[84]

La educación pública, gratuita y apropiada es definida por la Ley Federal de Educación Especial, *supra*, como la educación especial y los servicios relacionados pagados por el erario público y bajo supervisión y dirección pública que cumplen las exigencias de la agencia educativa estatal, los cuales incluyen educación preescolar, elemental o secundaria y se proveen conforme el PEI.[85] Mientras que, la Ley Núm. 55-1996, define la *educación especial* como una "enseñanza pública gratuita especialmente para responder a las necesidades particulares de la persona con impedimentos, en el ambiente menos restrictivo".[86]

Ahora bien, IDEA exige a toda agencia educativa que reciba asistencia al amparo de estas disposiciones, a establecer y mantener procedimientos para asegurar que los niños con impedimento y sus padres, tengan garantizados salvaguardas procesales ("procedural safeguards") con miras a lograr que se le provea una educación pública gratuita y apropiada.[87] Entre los procedimientos requeridos por la antes mencionada sección deben incluir entre otros: permitir que los padres puedan obtener una evaluación

---

[84] Véase: Exposición de Motivos de la "Ley de Servicios Educativos Integrales para Personas con Impedimentos"; *Orraca López v. ELA*, supra, pág. 41.
[85] 20 USC 1401 (9).
[86] 18 LPRA sec. 1351 (7).
[87] 20 USC 1415 (a).

educativa independiente de su hijo con impedimento y la oportunidad a cualquier parte de presentar una querella.[88]

Tanto la legislación federal como la estatal, garantizan el derecho del estudiante a ser educado en igualdad de condiciones que un estudiante sin discapacidad. A estos fines, se debe preparar el PEI, que es aquel documento mediante el cual se establecen las necesidades específicas académicas y funcionales del estudiante, y cómo se minimizarán "a través de los servicios que el programa de educación especial ofrece con el propósito de garantizar que el estudiante reciba una educación pública, gratuita y apropiada conocida como FAPE, por sus siglas en inglés".[89] De igual manera, es clasificado como el documento oficial que contiene servicios cobijados por legislación federal y estatal. [90] La ley IDEA dispone que, el Departamento de Educación tendrá disponible diferentes ambientes educativos (alternativas de ubicación) apropiados donde implementar el PEI para lograr que el estudiante con discapacidad se eduque y logre progresar en el currículo general.[91] El proceso de ubicación consta de dos procesos, a saber: a) la determinación de la alternativa de ubicación, donde se implementará el PEI. La ubicación deberá ser en una escuela pública, apropiada para el estudiante y de forma gratuita. Además, de acuerdo a la FAPE, entre otras cosas, esta garantiza que al estudiante se le ofrezca una educación especial que **le permita satisfacer las necesidades particulares que presenta**, b) la identificación de una localización donde se tiene disponible la alternativa de ubicación recomendada.[92]

---

[88] 20 USC 1415 (b)(1) y (b)(6); *Sch. Comm. Of Town of Burlington, Mass v. Dep´t of Educ. of Mass.*, supra, pág. 368.
[89] Sección 7.1 del *Manual de Procedimientos de Educación Especial*, pág. 65.
[90] *Íd.*
[91] Sección 8.1 del *Manual de Procedimientos de Educación Especial*, pág. 80.
[92] Sección 8.2 del *Manual de Procedimientos de Educación Especial*, págs. 80-81.

De acuerdo al *Manual de Procedimientos de Educación Especial*, existen varias alternativas de ubicación conforme a la Ley IDEA.  En lo pertinente al caso de epígrafe, una de estas lo es el salón regular.  Bajo esta alternativa, existen dos modelos educativos: salón regular con servicios relacionados y salón regular con servicios suplementarios.[93]  Es obligación del Departamento de Educación llevar a cabo un análisis sobre las alternativas de ubicación apropiadas conforme al PEI. La primera alternativa ha de ser en el sistema público, no obstante, cuando el Departamento de Educación no tiene disponible la alternativa de educación recomendada en el PEI, este podrá identificar una escuela privada para comprar el servicio educativo a costo público.[94]  De otro lado, los padres también podrán presentar una propuesta de una escuela privada de su predilección.[95]

Igualmente, la Ley Federal dispone que en las instancias en las que el Departamento de Educación no pueda ofrecerle los servicios educativos apropiados que el estudiante necesite en el sector público, este podrá comprar en el sector privado tales servicios educativos. 20 USC 1412 (A)(10)(B).  En específico, la Ley IDEA dispone:

El precitado estatuto también dispone lo siguiente:

**(B) Children placed in, or referred to, private schools by public agencies**

> **(i)   In general**
>
>> Children with disabilities in private schools and facilities are provided special education and related services, in accordance with an individualized education program, at no cost to their parents, if such children are placed in, or referred to, such schools or facilities by the State or appropriate local educational agency as the means of carrying out the requirements of this subchapter or any other applicable law requiring the provision of special education and related services to all children with

---

[93] Sección 8.1(2)(a) del *Manual de Procedimientos de Educación Especial*, pág. 82.
[94] Sección 8.3 del *Manual de Procedimientos de Educación Especial*, págs. 90-91.
[95] Sección 8.4 del *Manual de Procedimientos de Educación Especial*, pág. 96.

disabilities within such State. 20 USC 1412 (B)(i).

El Manual de Procedimientos de Educación Especial, también provee para que, si los padres objetan que el estudiante fuese ubicado conforme al PEI, cualquiera de las partes podrá solicitar una mediación previa a través del formulario SAEE-22 o solicitar una querella administrativa, con el formulario SAEE-23.[96] Dispone también la Ley Federal que, cuando se haya recibido una querella al amparo de las secciones (b)(6) o (k)[97], los padres o la agencia educativa envuelta en la querella tendrán la oportunidad de una vista imparcial que cumpla con el debido proceso de ley. 20 USC 1415 (f)(1)(A). La decisión del juez administrativo se apoyará en fundamentos sustantivos basados en la determinación de si el menor recibió una educación pública, gratuita y apropiada. 20 USC 1415 (f)(3)(E)(i). La *Ley de Servicios Educativos Integrales para Personas con Impedimentos*[98], dispone que, los padres de los niños con impedimentos tendrán derecho a radicar una querella con el fin de solicitar reunión de mediación o vista administrativa, en caso de que la persona con impedimentos no esté recibiendo una educación apropiada, en el ambiente menos restrictivo y de acuerdo a los arreglos de servicios contenidos en el P.I.S.F.,[99] P.E.I. o P.I.E.R.,[100] según sea el caso. Tanto IDEA como la Ley Núm. 51-1996 le proveen a los padres o tutores que entiendan que los servicios ofrecidos no son apropiados o no van acorde con las necesidades especiales del menor, la opción de presentar una querella y solicitar una vista administrativa ante un oficial examinador imparcial. *Orraca López v. ELA*, supra, pág. 42.

---

[96] Sección 8.4 (16) del *Manual de Procedimientos de Educación Especial*, pág. 98.
[97] K- Placement in alternative educational setting.
[98] Artículo 4, 18 LPRA sec. 1353 (b)(2).
[99] Plan Individualizado de Servicios a la Familia.
[100] Programa Individualizado Escrito de Rehabilitación.

Ahora bien, es normativa reiterada que, le corresponde al Departamento de Educación el garantizar que la determinación de la alternativa de ubicación del estudiante con discapacidades, sea tomada por el COMPU debidamente constituido, a base del PEI redactado y de conformidad con el principio de la alternativa menos restrictiva, conforme a lo dispuesto en la sección 300 114-120 del reglamento de la Ley IDEA. Es perentorio que, al analizar las posibles ubicaciones para implementar el PEI desarrollado, el COMPU lo haga **mientras respeta las necesidades del estudiante**, los recursos, las facilidades existentes y la viabilidad en cada alternativa de educar al estudiante junto a otros que no tienen discapacidades.[101] (*Énfasis suplido*).

En el caso de epígrafe, según explicáramos, a la menor se le realizó un PEI que obvió por completo las recomendaciones de la doctora Nannette Negrón, sobre la ubicación que, como perito, a su juicio mejor satisfacía las necesidades particulares de la menor SPPM. De acuerdo al testimonio de la doctora Nannette Negrón, debido a los diagnósticos y condiciones de la menor, le favorecía ser ubicada en un salón de corriente regular compuesto de seis estudiantes o menos[102]. No obstante, el PEI redactado no tomó en consideración tal recomendación ni se presentó una justificación para así hacerlo, así surge del propio testimonio de la facilitadora, señora Milián Canales[103]. A base de ello, los ofrecimientos de alternativas de ubicación realizados por el ente recurrido se alejaron por completo de buscar satisfacer las necesidades de la menor SPPM. Pues, las escuelas ofrecidas y visitadas por la señora Matos Lamourt se componían de salones de corriente regular de más de seis estudiantes. Puntualizamos que, durante la vista

---

[101] Sección 8.5 del *Manual de Procedimientos de Educación Especial*, pág. 99.
[102] TPO de 5 de octubre de 2023, pág. 21, líneas 1-25; pág. 22, líneas 1-25.
[103] TPO de 5 de octubre de 2023, pág. 138, líneas 7-25; pág. 139, líneas 1-9.

administrativa, en ningún momento fue impugnado el testimonio de la doctora Nannette Negrón ni su informe. Cabe destacar que, de acuerdo al testimonio de la señora Matos Lamourt, la menor estuvo matriculada en el sector privado para el año escolar 2022-2023, en un salón de diez (10) estudiantes, donde su experiencia fue difícil y donde tuvo grandes dificultades[104]. De igual manera, además de tal testimonio, surge de las propias determinaciones de hechos del foro recurrido que, a la menor se le hizo muy difícil completar el año escolar 2022-2023.[105] No obstante, en el Centro AEIOU, dentro de la corriente regular de menos de seis estudiantes, la menor SPPM ha demostrado progreso.[106]

Conforme al derecho expuesto, le correspondía al ente recurrido ofrecerle a la menor alternativas que se atemperaran a sus necesidades específicas. El norte de la legislación federal como la estatal es que, los menores reciban la educación adecuada y sean ubicados dentro de alternativas donde se satisfagan y se respeten sus necesidades. En este caso en particular, colegimos que, el Departamento de Educación incumplió con su deber respecto al ofrecimiento de alternativas adecuadas de ubicación. Ante tal incumplimiento de la agencia, la señora Matos Lamourt se movilizó e informó que matricularía a la menor en una institución privada y que, radicaría la querella correspondiente. Como bien reseñáramos, nuestro ordenamiento provee para que, en las instancias que los padres no estén de acuerdo con lo sugerido o entiendan que los servicios ofrecidos no son apropiados o no van acorde con las necesidades especiales del menor, presenten una querella y soliciten una vista administrativa. De igual forma, provee para que, los

---

[104] TPO de 5 de octubre de 2023, pág. 61, líneas 7-12.
[105] Determinación de hecho #2 de la *Resolución* de 23 de octubre de 2023.
[106] TPO de 5 de octubre de 2023, pág. 42, líneas 16-25.

padres matriculen a los estudiantes en el sector privado cuando se presentan las condiciones anteriormente mencionadas.

Conforme mencionamos anteriormente, un estudiante se considera ubicado por sus padres cuando **el Departamento de Educación tiene y ha ofrecido una alternativa de ubicación y una localización pública donde implementar el programa educativo individualizado** y los padres, aun así, deciden que la educación será provista por una escuela privada. (*Énfasis suplido.*) Dicho acto constituye un rechazo de la alternativa de ubicación pública, gratuita y apropiada y su localización.[107] No es correcta la determinación del foro recurrido respecto a que en este caso, se constituyó una ubicación unilateral por parte de la madre de la menor SPPM. Ello, puesto que, el ente recurrido no cumplió con identificar una alternativa de ubicación apropiada a nivel público para implementar el PEI. Queda claro que, en el caso de epígrafe, las circunstancias dispuestas por el precitado estatuto no estuvieron presentes de ninguna forma.

Es necesario señalar que, la señora Matos Lamourt notificó que rechazaba el ofrecimiento de la agencia recurrida el 17 de agosto de 2023, mediante misiva enviada por correo electrónico[108] y cuatro días después, es decir, el 21 de agosto de 2023, la matriculó en el sector privado. Si bien es cierto que, el *Manual de Procedimientos de Educación Especial*, supra, y la legislación federal disponen que la notificación deberá realizarse con diez (10) días de anticipación a la matricula, con el propósito de que el Departamento de Educación pudiese tener la oportunidad de proveer nuevos ofrecimientos, en las circunstancias particulares de este caso, el así hacerlo, hubiese sido en detrimento para la menor. Puesto que, ya el año escolar había comenzado, y los padres se hubiesen visto obligados a dejar a

---

[107] Sección 9.1 del *Manual de Procedimientos de Educación Especial*, pág. 101.
[108] TPO de 5 de octubre de 2023, pág. 88, líneas 12-25, pág. 89, líneas 1-2.

la menor en una ubicación que podía ser inapropiada para sus necesidades hasta tanto el Departamento de Educación volviese a evaluar y a pasar por el procedimiento de conseguir una ubicación adecuada. Pues, según el testimonio de la doctora Nannette Negrón, si la menor no estuviese en una ubicación apropiada para ella, sus niveles de ansiedad aumentarían y sería perjudicial[109]

Es meritorio señalar que, nada impedía que, pese a que la menor fue matriculada en el sector privado, el Departamento de Educación ofreciera una alternativa que se ajustara a las necesidades de esta en el sector público. Pues bien surge del testimonio de la señora Matos Lamourt, que esta siempre estuvo en la mejor disposición de aceptar tal alternativa[110].

Según es sabido, la norma general es que, la Ley Federal no requiere que se pague por los costos de educación y otros servicios relacionados en una institución privada, si la agencia encargada puso a la disposición del estudiante una educación pública y apropiada y los padres optaron por la alternativa privada.[111] Sin embargo, ante la falta de una alternativa apropiada, y conforme a legislación y jurisprudencia federal[112], procede la compra de servicios en el sector privado y que se le reembolse a los padres lo pagado desde que se determinó la elegibilidad de la menor SPPM al Programa de Educación Especial, hasta tanto el Departamento de Educación cumpla con su deber. Debemos reseñar que, de la prueba desfilada surge que la ubicación de la menor en el sector privado ha sido beneficiosa para ella y se atempera a sus necesidades particulares.

---

[109] TPO de 5 de octubre de 2023, pág. 24, líneas 3-23; pág. 27, líneas 3-5, 14-16 y 19-25.
[110] TPO de 5 de octubre de 2023, pág. 79, líneas 15-24.
[111] 20 USC 1412 (a)(10)(C)(i).
[112] Véase School Committee v. Dept. of Educ, supra; y *Florence County v. Carter*, supra.

Como último señalamiento de error, la parte recurrente sostiene que, el foro recurrido incidió al privarle de su debido proceso de ley al prohibir la presentación de una solicitud de reconsideración, a pesar de no haber puesto en efecto la estructura requerida por la Ley Federal para la solución de querellas y su proceso de revisión interna en la agencia.

Adelantamos que, no le asiste la razón. Veamos.

Tratándose de una causa de acción legislada inminentemente en la esfera federal, la cual no contempla el mecanismo de reconsideración para este tipo de caso, entendemos que no incidió la agencia recurrida al no proveer la oportunidad de presentar reconsideración. No obstante lo anterior, en nada incide el resultado en la medida en que, la parte recurrente acudió ante este foro de forma oportuna y por tanto, no se le afectaron sus derechos.

**IV**

Por los fundamentos que anteceden, se revoca la resolución recurrida y se ordena al Departamento de Educación el pago de los servicios reclamados.

Notifíquese.

Lo acordó y manda el Tribunal, y certifica la Secretaria del Tribunal de Apelaciones. La Juez Barresi Ramos disiente sin escrito.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones